429 S.E.2d 496

**David F. GRAF, M.D., Plaintiff Below, Appellee,**

v.

**WEST VIRGINIA UNIVERSITY, Defendant Below, Appellant,**

**and**

**West Virginia University Medical Corporation, Intervenor– Appellant.**

**No. 20722.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 6, 1992.

Decided Dec. 11, 1992.

---

Larry Harless, Evans, for appellee.

Herbert G. Underwood, Karen E. Kahle, Steptoe & Johnson, Clarksburg, and Mario Palumbo, Atty. Gen., Daniel W. Vannoy, Sp. Asst. Atty. Gen., Charleston, for appellant and defendant below.

Rebecca A. Betts, King, Betts & Allen, Charleston, for intervenor, appellant.

NEELY, Justice:

This case involves the right of a faculty member of the West Virginia University Medical School to "moonlight." Both a grievance board and the Circuit Court of Monongalia County found that a faculty member does have that right. On that question, we affirm. The circuit court, however, decided that the Educational Employees Grievance Board did not have the power to award damages. We find that grievance hearing officers do, in fact, have the power to award damages in this situation; therefore, we reverse the circuit court on that issue, and remand this case to the Educational Employees Grievance Board for a determination of the amount of lost wage damages.

I.

The Medical School of West Virginia University, like most medical schools, has an affiliated corporation (West Virginia University Medical Corporation) to which its full-time faculty are required to belong.

West Virginia University Medical Corporation (WVUMC), in name a private corporation, was created pursuant to Board of Governors Order No. 3214 (January 26, 1961) that "an office shall be maintained" to perform all billing for the work done by the faculty in university facilities. The fees collected were to be used, in part, to supplement the salaries of the faculty. All full-time medical school faculty are now required to sign employment contracts with both West Virginia University (WVU) and WVUMC. The hearing examiner found several examples of the close ties between WVU and WVUMC:

(1) [WVUMC] was incorporated by the Vice–President, deans and department heads of the School of Medicine.

(2) [WVUMC] does not solicit, interview or hire its physician employees, nor does it determine their salary or define their job duties. All of these are responsibilities of the Dean of the School of Medicine.

(3) A substantial part of the faculty-physicians' salary is contributed by [WVUMC] which collects fees from the patients treated by the faculty member as part of his regularly assigned duties.

(4) The medical school underwrites the entire cost of liability and malpractice insurance for Corporation employees.

(5) All administrative policies of the Corporation must be approved by the President of West Virginia University.

(6) The Corporation's Board of Directors is composed of full-time physician-faculty members. The Vice–President for Health Services and the Dean of the School of Medicine are *ex-officio*, nonvoting members.

Hearing Examiner's Decision, 27 September 1986, at 7–8.

David Graf, the appellee, is a tenured "geographic full-time faculty member" of WVU Medical School and affiliated with WVUMC. Since 1979, the year he began to work as a faculty member at WVU, Dr. Graf has signed contracts with both the school and with WVUMC annually. From 1980 through 1982, Dr. Graf explicitly wrote into his contracts that he accepted

his faculty appointment subject to Policy Bulletin No. 36 of the Board of Regents and the employee handbook. Starting in 1983, Dr. Graf's additions were no longer necessary, as the form contract read:

This appointment is made by virtue of, and is subject to, the authority vested by law in the West Virginia Board of Regents. Faculty appointments are in accordance with the provisions of the current Board of Regents Policy Bulletin No. 36, and those of the West Virginia University *Faculty Handbook* (1983).

Policy Bulletin No. 36 is the general policy of the Board of Regents regarding academic freedom, personnel actions and grievance procedures. At the time Dr. Graf signed his contracts, Policy Bulletin No. 36 read, in part:

Section 3.03.

The appointment of a person to a full-time position at an institution is made subject to the following conditions:

a. The appointee shall render full-time service to the institution to which appointed. Outside activities shall not be restricted unless such activities or employment interfere with the adequate performance of academic duties. The administration of each institution shall establish a program of periodic review of outside services of appointees to guide faculty members.

b. If outside employment or service interferes with the performance of the regular institutional duties of the appointee, the institution has a right to

make such adjustments in the compensation paid to such appointee's services lost to the institution, and by the appointee's use of institutional equipment and materials.[1]

Additionally, the *Faculty Handbook* (1983) provides:

One working day per week may normally be used for consulting for organizations other than the University. Such consulting work must be reported to the departmental chairperson, who reports to the dean regarding the extent of consulting by various members of the department.

Dr. Graf was told by his department chairman, Dr. Knapp, when he first accepted his position at WVU Medical School that he could continue to practice emergency medicine away from the University during his off-duty hours. Dr. Graf informed the department chairmen that succeeded Dr. Knapp of his outside activities as well. Dr. Graf's performance of his duties, by all accounts, was excellent; he performed well enough to be granted tenure in 1985.[2] Furthermore, Dr. Graf procured his own malpractice insurance for his outside activities; WVU and WVUMC did not bear any additional cost due to Dr. Graf's moonlighting activities.

Part I-D of the by-laws of WVUMC (1983), however, placed a far stricter requirement on Dr. Graf than did the Board of Regents:

Strict full-time and geographic full-time faculty members will render patient services only within the West Virginia Uni-

---

1. In 1992, the Board of Trustees amended Policy Bulletin No. 36 explicitly to authorize the restrictions that the medical and dental school faculty practice plans place on the outside practice of their faculty members. W.Va.C.S.R. § 128–36–4.3 (1992). Thus our decision about the conflict of Policy Bulletin No. 36 and the by-laws of WVUMC (and the effect of that conflict on Dr. Graf and his relationship with the university) will have no prospective effect; the conflict no longer exists.

2. The circuit court found:

During the period of his employment, Dr. Graf obtained the rank of associate professor of anesthesiology in 1983 and received tenure in 1985. There is not a suggestion from any witness on behalf of West Virginia University that the outside activities of Dr. Graf, that is,

his moonlighting as an emergency room physician at two Pennsylvania hospitals during his off days, vacations and weekends, interfered with the performance of his academic duties.... By letter of May 23, 1984, Dr. Graf's department chairman, Dr. Richard W. Eller, wrote to Dean DeVaul stating that he approved the outside employment of Dr. Graf and it did not cause any problems with his activities as a staff member of the Department of Anesthesiology. Dr. Eller testified that he was a valuable employee and even indicated that his training in emergency medicine was helpful in performing his duties as a faculty member.

Memorandum/Order of Circuit Court of Monongalia County, 15 February 1991, at 14–15.

versity Medical Center, its branches, and authorized Corporate facilities, or where functions of the School of Medicine include defined and documented educational extramural activities authorized by the Department or Division Chairperson and the Dean of the School of Medicine.

In May of 1984, Dr. Graf was called into a meeting with Richard DeVaul, dean of the medical school, and several other members of the medical school faculty. At that meeting, Dr. DeVaul asked Dr. Graf if he were performing outside emergency room work. Dr. Graf acknowledged that he was. Then Dr. DeVaul ordered Dr. Graf to cease his outside activities, or else his employment at the WVU medical school would be terminated. After several discussions among Dr. Graf, Dr. DeVaul and Dr. Eller (then Dr. Graf's department chairman) about alternatives that would allow Dr. Graf to continue his emergency room work, no satisfactory solution was worked out. Dr. Graf was forced to cease his "moonlighting" emergency room work by June of 1984.

After examining his options (and after receiving his tenure), Dr. Graf initiated grievance proceedings against Dr. DeVaul and West Virginia University, pursuant to *W.Va.Code* 18–29–1, *et seq.* [1985]. After pursuing his grievance through the various levels, Dr. Graf filed his Level IV grievance on 13 December 1985. The hearing examiner ruled on 26 September 1986. Both parties then appealed to the Circuit Court of Monongalia County. The circuit court upheld the hearing examiner's decision with regard to Dr. Graf's right to "moonlight", but reversed the damage award, holding that the hearing examiner was without power to award such damages.

### II.

■ Once again we are faced with the preliminary matter of determining the effect of the filing of a motion to reconsider on the available time for appeal. As we held in Syl. pt. 1, *Lieving v. Hadley*, 188 W.Va. 197, 423 S.E.2d 600 (1992), "[a] mo-

tion to amend or alter judgment, even though it is incorrectly denominated as a motion to 'reconsider', 'vacate', 'set aside', or 'reargue' is a Rule 59(e) motion if filed and served within ten days of entry of judgment."

We want to emphasize again the importance of correctly denominating motions. As we held in *Lieving*:

[W]hen making a Rule 59(e) motion it is very important plainly to call that motion a "Rule 59(e) motion to alter or amend judgment." It is very confusing both to a trial court and to opposing counsel to make motions that do not clearly fall within the ambit of a particular rule. Furthermore, it allows opposing counsel to make motions to dismiss appeals in this Court for lack of timeliness, when such motions would not be invited were they properly styled as a "Rule 59(e) motion to alter or amend judgment."

*Lieving*, 188 W.Va. 197, 201, 423 S.E.2d 600, 604 (1992).

■ We are also concerned about the reliance of counsel on law beyond the syllabus points in *per curiam* opinions of this Court. Dr. Graf relied on *Rowan v. McKnight*, 184 W.Va. 763, 764, n. 2, 403 S.E.2d 780, 781, n. 2 (1991) (*per curiam*), in which we noted in *obiter dicta* that motions to reconsider do not ordinarily toll the period for appeal. That decision was rendered on the basis of a Rule 60(b) motion which *does not* toll the time for appeal. Lawyers should not rely on seeming new law created by *per curiam* opinions. In *Lieving*, we noted:

It is important to point out this Court's traditional approach to *per curiam* opinions. *Per curiam* opinions, such as *Rowan*, are used to decide only the specific case before the Court; everything in a *per curiam* opinion beyond the syllabus point is merely *obiter dicta*. A *per curiam* opinion that appears to deviate from generally accepted rules of law is not binding on the circuit courts, and should be relied upon only with great caution.... However, if rules of law or accepted ways of doing things are to be changed, then this Court will do so in a signed opinion, not a *per curiam* opinion.

*Lieving,* 188 W.Va. at 201, 423 S.E.2d at 604, n. 4.

█ In this case, the motion for reconsideration was filed within the Rule 59(e) ten-day period. On 15 February 1991, the final judgment Order was entered by the circuit court. On 25 February 1991, WVU filed its "Motion for Reconsideration" with the circuit court. Because the motion was, in fact, a Rule 59(e) motion, the time for appeal was tolled under Rule 72 until the motion to reconsider was denied on 21 May 1991. The four-month period then began, and on 23 September 1991[3] the petition to this Court was timely filed. Therefore, the appeal is properly before this Court.

### III.

█ The West Virginia Board of Regents was created by the Legislature to control and supervise higher education in this State. *W.Va.Code* 18–26–1 [1988].[4] The schools that were subject to the jurisdiction of the Board of Regents could not impose regulations that conflicted with the validly promulgated regulations of the Board:

> The purpose of the Legislature in the enactment of this article is to establish a state agency to be known as the West Virginia board of regents which will have the general determination, control, supervision and management of the financial, business, and educational policies and affairs of all state institutions of higher education.

*W.Va.Code* 18–26–1 [1988]. It is without question that the Board of Regents had the authority to promulgate Policy Bulletin No. 36, and that the Board of Regents had plenary power over the schools under its aegis. *State ex rel. McLendon v. Morton,* 162 W.Va. 431, 433, 249 S.E.2d 919, 921 (1978); *Board of Regents v. Fairmont, Morgantown and Pittsburgh Railroad Company,* 155 W.Va. 863, 866, 189 S.E.2d 40, 43 (1972). Therefore, it is clear that the schools subject to the Board of Regents' authority could not impose regulations on faculty members that contradicted the policy of the Board of Regents.[5]

█ Policy Bulletin No. 36 guaranteed to all full-time employees that "[o]utside activities shall not be restricted unless such activities or employment interfere with the adequate performance of academic duties." The record is clear that Dr. Graf's off-duty performance of emergency medicine did not affect his ability to teach, nor did it affect his ability to render service at WVU Hospital. Indeed, Dr. Graf's maintenance of his certification in emergency room medicine benefitted his students by allowing him to broaden the students' knowledge of emergency room medicine in addition to their knowledge of anesthesiology. Dr. Eller, one of Dr. Graf's department chairmen, testified that Dr. Graf's board certification in emergency medicine did, in fact, enhance his teaching.

█ Despite the fact that Dr. Graf's "moonlighting" conformed with Policy Bulletin No. 36, the policy of the Board of Regents, it did not comport with the by-laws of the West Virginia University Medical Corporation. The fact that all West

---

**3.** Note that 21 September 1991 was a Saturday, and 23 September 1991 was the first judicial business day after that Saturday. *See W.Va. Code* 2–2–2 [1973].

**4.** In 1989, the Legislature repealed the code sections that established the Board of Regents. Acts 1989, c. 64. Before 1989, the Board of Regents had run the entire statewide higher education system. The Legislature split the powers of the Board of Regents between the "University of West Virginia Board of Trustees", which governs the West Virginia University system (all WVU campuses, including the school of medicine; Marshall University; the University of West Virginia College of Graduate Studies; and the West Virginia School of Osteopathic Medicine), and the "Board of Directors of The State College System", which governs the state colleges, community colleges, and other post-secondary education. *W.Va.Code* 18B–1–1, *et seq.* [1989].

**5.** It is also clear that the Board of Regents, as the Board of Trustees subsequently has, had the power to implement the faculty practice plan and to restrict the outside activities of geographic full-time faculty at the medical school. At issue in this case is not whether the Board had the power to restrict outside activities, but whether the Board did, in fact, restrict such activities at the time about which Dr. Graf is now complaining.

Virginia University School of Medicine faculty must also work for WVUMC makes it clear that WVUMC is conducting the University's business. Therefore, the actions of WVUMC with regard to employment must be subject to the rules and regulations of the Board of Trustees *né* Regents. With regard to employment, the West Virginia University Medical School cannot do indirectly (via WVUMC) what it is prohibited from doing directly. *See Adkins v. Miller,* 187 W.Va. 774, 781, 421 S.E.2d 682, 686 (1992); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972) (government not allowed to "produce a result which (it) could not command directly", quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)). Therefore, the Medical School could not prohibit Dr. Graf from moonlighting, so long as Dr. Graf conformed with the Board of Regents' regulations regarding the accommodation of his full time faculty duties and outside activities.

Furthermore, any doubts that the terms of Dr. Graf's employment permitted him to "moonlight" can be resolved in favor of Dr. Graf by the fact that the contracts he signed with WVU explicitly stated that the agreement was subject to Policy Bulletin No. 36. Dr. Graf intentionally added the provisions referencing Policy Bulletin No. 36 in order to ensure that he would be protected by its provisions. Nobody representing the school ever objected to his insertions and, in fact, thought they were a good enough idea so that they became part of the standard form contract.

It is clear, then, that neither the Medical School nor West Virginia University Medical Corporation had the power to restrict Dr. Graf's moonlighting activities. Both the Circuit Court of Monongalia County and the hearing examiner were correct.

## IV.

The question also is raised by Dr. Graf on cross-assignment whether Dr. Graf is entitled to a damage award for his lost wages. The Educational Employees Grievance Board's hearing examiner initially concluded that Dr. Graf is entitled to lost wage damages.[6] The circuit court overruled that decision, not on the basis that it was clearly wrong,[7] but because the circuit court believed that the Educational Employees Grievance Board did not have the power to award such damages. We disagree.

*W.Va.Code* 18–29–2(a) [1992] provides:

"Grievance" means any claim by one or more affected employees of the board of regents ... alleging a violation, a misapplication or a misinterpretation of the statutes, policies, rules, regulations or written agreements under which such employees work, including any violation, misapplication or misinterpretation regarding compensation, hours, terms and conditions of employment, employment status or discrimination.

Furthermore, "[h]earing examiners are hereby authorized and shall have the power to ... provide such relief as is deemed fair and equitable ..., and such other powers as will provide for the effective resolution of grievances." *W.Va.Code* 18–29–5(b) [1992].

Clearly the Legislature intended to give the examiners who hear the grievances the power to fashion any relief they deem necessary to remedy wrongs done to educational employees by state agencies. Of course such power is limited by law and by both the *Constitution of the United States* and the *Constitution of the State of West Virginia.* The circuit court based his ruling denying damages on his conclusion that the Educational Employees Grievance

6. "In consideration of the foregoing and the record as a whole, the grievant's request that he be allowed to engage in outside activities in conformity with Board of Regents Policy Bulletin No. 36 and that he be compensated for wages lost pursuant to the Dean's order to terminate these activities is granted." Hearing Examiner's Decision, 27 September 1986, at 22.

7. Indeed, the Circuit Court held that Dr. Graf "should be compensated for any lost wages incurred as a result of his engaging in outside activities." Memorandum/Order of Circuit Court of Monongalia County, 15 February 1991, at 22.

Board does not have the power to award damages because of the defendant's constitutional right to a jury trial as guaranteed by *W. Va. Const.* Art. 3, § 13. This section provides:

> In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved; and in such suit in a court of limited jurisdiction a jury shall consist of six persons. No fact tried by a jury shall be otherwise reexamined in any case than according to rule of court or law.

As we interpreted this constitutional provision in *Perilli v. Board of Education,* 182 W.Va. 261, 387 S.E.2d 315 (1989) (plaintiff's right) and *Bishop Coal v. Salyers,* 181 W.Va. 71, 380 S.E.2d 238 (1989) (defendant's right), the general rule is that both plaintiffs and defendants have a right to a jury trial in an action for damages.

■ In this case, like *Salyers,* a defendant is claiming that an administrative agency may not award damages due to the lack of a jury trial. However, this case is not *Salyers* in one very real respect: here the defendant is West Virginia University, an agency of the state itself! As we held in *State ex rel. Board of Governors of West Virginia University v. Sims:*

> The power to authorize the expenditure of public funds is vested in the Legislature, and, unless delegated by it under its legislative power, either in express terms, or by necessary implication from powers so delegated, it can not be exercised by any subordinate agency of the State government.

Syl. pt. 1, *Sims,* 133 W.Va. 239, 55 S.E.2d 505 (1949). The Legislature's purpose in establishing the entire Educational Employees Grievance Board was to provide a relatively quick, yet fair procedure to resolve disputes between state educational employees and the State's educational institutions so that "effective job performance may be enhanced and the citizens of the community may be better served." *W. Va. Code* 18–29–1 [1992]. Furthermore, the grievance procedure was established "to provide a simple, expeditious and fair process for resolving problems ... and shall be construed to effectuate that purpose." *W. Va. Code* 18–29–1 [1992].

The Legislature has made the determination that the state is better served by allowing hearing examiners to determine "fair and equitable" relief in a simple and quick setting. This system is designed to invest scarce government resources in solving problems rather than investing those resources in an army of lawyers to go to court to defend against every employee complaint. The damage award is constitutionally proper against West Virginia University.

In rendering her decision, however, the hearing examiner failed to specify the amount of damages to be awarded. Therefore, the case must be remanded to the Educational Employees Grievance Board so that the hearing examiner may determine the amount of damages to be assessed.[8]

### V.

Dr. Graf was wrongfully prevented from moonlighting by the West Virginia University School of Medicine. Furthermore, the Circuit Court of Monongalia County erred in holding that the hearing examiner did not have the power to award lost wages damages to Dr. Graf. For the foregoing reasons, the case is affirmed, in part, reversed, in part, and remanded to the Educational Employees Grievance Board for further proceedings consistent with this opinion.

Affirmed, in part, Reversed, in part, and remanded.

---

**8.** West Virginia University was the only named defendant at the Level IV hearing stage; therefore, only West Virginia University (not WVUMC) would be liable for the damages to be assessed by the hearing examiner on remand.