453 S.E.2d 402

**BOARD OF EDUCATION OF the COUNTY OF MERCER, Petitioner Below, Appellant,**

v.

**Charles WIRT, Respondent Below, Appellee.**

**No. 22117.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1994.

Decided Dec. 21, 1994.

Kathryn Reed Bayless, Princeton, for appellant.

David M. Katz, Bluefield, for appellee.

CLECKLEY, Justice:

The Mercer County Board of Education (Board of Education) appeals the final order

of the Circuit Court of Mercer County, entered on September 9, 1993, that affirmed the findings and conclusions made by the Chief Administrative Law Judge (ALJ) at a level IV grievance hearing. The circuit court specifically found no reason to reverse the decision upon the grounds listed in W.Va. Code, 18–29–7 (1985).[1] Therefore, the circuit court ordered the Board of Education to reinstate Charles Wirt, the respondent below and appellee herein, to the position of head custodian at Ramsey Elementary School; to award him backpay; to redact references of his suspension and dismissal from his personnel file; and to award $1,000 in attorney's fees. The Board of Education asserts the ALJ erred by ruling Mr. Wirt was denied adequate notice and an opportunity to respond to charges when his termination was made pursuant to W.Va.Code, 18A–2–8 (1990). In addition, the Board of Education claims the circuit court erred by affirming the level IV decision finding the Board of Education failed to prove "the grievant engaged in immoral conduct[.]"

## I.

### FACTS

On September 29, 1992, Amanda W.,[2] a sixth-grade student at Ramsey Elementary School, reported to her school principal, John Fleming, that Mr. Wirt touched her breast and buttocks on September 25, and September 28, 1992. Shortly thereafter, Mr. Fleming, Mr. Wirt, and Rick Ball, an elementary supervisor, met to discuss the allegations, and Mr. Wirt agreed to change his scheduled shift to work at night.

The interim school superintendent, Dr. Deborah Akers, ordered an investigation of the allegations made by Amanda W. On October 10, 1992, Dr. Akers met with Mr. Wirt at which time she suggested Mr. Wirt resign his position. Mr. Wirt refused, and, by letter dated October 13, 1992, Dr. Akers gave notice to Mr. Wirt that he was suspended without pay pursuant to W.Va.Code, 18A–2–7 (1990),[3] for "the inappropriate touching of a female student." In the letter, Dr. Akers also informed Mr. Wirt she would "present charges and a recommendation to the Board of Education concerning further action" pursuant to W.Va.Code, 18A–2–8.

By letter dated October 28, 1992, Dr. Akers notified Mr. Wirt she would present charges to the Board of Education on November 2, 1992, and, after the Board of Education heard the charges, a written copy of the charges would be given to him. The letter also specifically said:

"The Board of Education will not conduct a hearing concerning these charges prior to acting upon any recommendation.... However, you should feel free to attend the Board meeting. If you so desire and the Board is in agreement, you may have the opportunity of addressing the Board concerning the charges.... The opportunity to address the Board is voluntary in nature and it is not required that you attend the meeting nor is it required that you address the Board if you do attend."

According to the Board of Education's brief, Mr. Wirt and his counsel attended the Board of Education meeting. The Board of Education voted 4–0 to terminate Mr. Wirt's employment. Mr. Wirt officially was notified

---

1. W.Va.Code, 18–29–7, provides, in relevant part:
 "The decision of the hearing examiner shall be final upon the parties and shall be enforceable in the circuit court: Provided, That either party may appeal to circuit court of the county in which the grievance occurred on the grounds that the hearing examiner's decision (1) was contrary to law or lawfully adopted rule, regulation or written policy of the chief administrator or governing board, (2) exceeded the hearing examiner's statutory authority, (3) was the result of fraud or deceit, (4) was clearly wrong in view of the reliable, probative and substantial evidence on the whole record, or (5) was arbitrary or capricious or character-

ized by abuse of discretion or clearly unwarranted exercise of discretion."

2. As is our traditional practice, we avoid using the last names of the parties in cases involving sensitive facts. *See State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994); *State ex rel. Div. of Human Serv. by Mary C.M. v. Benjamin P.B.*, 183 W.Va. 220, 395 S.E.2d 220 (1990).

3. W.Va.Code, 18A–2–7, provides, in part, "[t]he superintendent, subject only to approval of the board, shall have authority to ... suspend school personnel and to recommend their dismissal pursuant to provisions of this chapter."

of his termination by a letter dated November 4, 1992. Subsequently, Mr. Wirt filed to have a level IV grievance hearing.

A level IV hearing was held on December 8, 1992. At the hearing, Dr. Akers, Amanda W., Mr. Wirt, and two witnesses of one of the incidents testified. The two witnesses were Carrie B., a sixth-grade student, and Jessie Hurt, a custodian.

Amanda W. testified Mr. Wirt inappropriately touched her on two occasions. The first incident, on September 25, 1992, occurred when she was near a snack machine. The second incident, on September 28, 1992, occurred in the school cafeteria. Amanda W. said Mr. Wirt touched her similarly on both days. Amanda W. alleged Mr. Wirt put his right hand over her shoulder and then used his right hand to touch her right breast. She claimed he also touched her "[a]bout mid-way down the buttocks area," and he brought his arm up the right side of her body with his hand under her right breast. On cross-examination, Amanda W. agreed with Mr. Wirt's counsel that Mr. Wirt "brushed" her breast on September 25. She stated she did not tell anyone immediately after it happened on September 25, because she thought it was an accident. However, she told her mother about both incidents after school on September 28.

Amanda W. also testified on cross-examination the incident on September 28 occurred while she was putting her coat on a stage in the cafeteria, and she said the students in the cafeteria line were "right in front of [her]." She asserted she was facing the stage with her back to the other students when Mr. Wirt put his arm around her waist and then "[h]e brought it up and touched my butt and then he put his around [sic] here and came up and touched my . . . under my breast." (Ellipsis in original). In addition, she alleged Mr. Wirt had his hand on her buttock for "[a] couple of minutes."

Carrie B. said she and Amanda were close to each other and facing each other in the cafeteria line when the touching occurred. Carrie B. asserted the two girls were near an ice cream machine which was about fifteen steps away from the stage area. Carrie B. described Mr. Wirt as being beside Amanda W. when she saw him "put his [right] arm around Amanda and [he] touched her breast and then when [he] was ready to leave, he touched her rear end." Carrie B. said Mr. Wirt did not put his hand around Amanda W.'s waist, but put it on her shoulder, and he patted her left buttock. Although she claimed Amanda W. was facing her, Carrie B. stated she could tell Mr. Wirt patted Amanda W.'s buttock by the way he moved his hand. When Carrie B. was asked if she saw Amanda W. near the stage when the touching occurred or if she noticed Amanda W. putting her coat on the stage, Carrie B. replied no. She also maintained she saw Mr. Wirt pat Amanda W. on the buttocks in the hallway a few days after September 28.

Mr. Wirt's counsel attempted to discredit Carrie B.'s testimony by disclosing that Mr. Wirt was suspended in January, 1990, for his "threatening action and words to a student of Ramsey Elementary School." Mr. Wirt admitted it involved pulling a knife on Carrie B.'s older brother. Carrie B. indicated she had no bad feelings or problems with Mr. Wirt as the result of what happened with her brother.

Mr. Hurt also testified he witnessed Mr. Wirt touching Amanda W. He said Amanda W. had put her coat at a table before she got her lunch, and he saw her near the stage two or three times standing in line. He claimed he never saw Amanda W. and Mr. Wirt together by the stage. Mr. Hurt stated Amanda W. was near the ice cream machine when Mr. Wirt approached her on her right side. Mr. Hurt then alleged Mr. Wirt "put his left arm around" Amanda W.'s neck and rubbed her breast.[4] He alleged Mr. Wirt remained in the position for "five to ten

---

4. During direct examination, it seems that Mr. Hurt was indicating Mr. Wirt used his right hand to touch Amanda W.'s breast and buttock. The relevant transcript section reads as follows:

"Mr. Hurt: Well, he put his arm around her and touched her on her breast and patted her on her behind.
"Ms. Bayless: All right, you're motioning with your right arm?
"Mr. Hurt: Right."

minutes," but he did not see Mr. Wirt put his hand around Amanda W.'s waist. Mr. Hurt claimed Mr. Wirt tapped Amanda W.'s buttock when he walked away from her.

Immediately thereafter, Mr. Hurt asserted he spoke with Mr. Wirt. He also told the school principal. He testified he never spoke to Amanda W. or to Carrie B. about the incident. Mr. Hurt maintained he and Mr. Wirt had some problems over the years, but "got along pretty good."

Mr. Wirt testified he and Mr. Hurt had problems on a regular basis. He also consistently has denied the allegation that he inappropriately touched Amanda W. However, he did state he remembered one occasion when Amanda W. and another child were running in the cafeteria near the stage when Amanda W. slipped and he grabbed her "by the strap or waistband on her jeans" to prevent her from hitting her head against a table. Mr. Wirt was not sure the date of this event. Amanda W. and Carrie B. both testified they did not remember such an event.

## II.

### PRE–TERMINATION HEARING

The first issue presented by this case is whether Mr. Wirt was entitled to a pre-termination hearing before the Board of Education under W.Va.Code, 18A–2–8. In essence, the ALJ concluded Mr. Wirt was entitled to a pre-termination hearing. Furthermore, the ALJ determined Mr. Wirt not only was denied a proper hearing, but he also was denied proper notice containing sufficient information for him to defend himself against the allegations presented to the Board of Education. For the reasons stated below, we agree, and we hold due process generally requires some form of a pre-termination hearing under W.Va.Code, 18A–2–8.

W.Va.Code, 18A–2–8, establishes the procedure by which a Board of Education may suspend or dismiss a school employee, and it covers the right of an employee to appeal such a decision. This statute was amended in 1985 and 1990. Prior to 1985, W.Va.Code, 18A–2–8 (1969), in relevant part, explicitly

provided an employee is entitled to written charges and "shall be given an opportunity to be heard by the board upon not less than ten days' written notice, which charges and notice shall be served upon the employee within five days of the presentation of the charges to the board." In 1985, the legislature removed from the statute an employee's right "to be heard by the board[.]" The statute again was amended in 1990, but the legislature did not reinstate this language.[5]

The 1990 version of the statute applies to this case. The 1990 version of W.Va.Code, 18A–2–8, provides, in pertinent part:

"Notwithstanding any other provisions of law, a board may suspend or dismiss any person in its employment at any time for: Immorality.... The charges shall be stated in writing served upon the employee within two days of presentation of said charges to the board. The employee so affected shall be given an opportunity, within five days of receiving such written notice, to request, in writing, a level four hearing and appeals pursuant to provisions of article twenty-nine [§ 18–29–1 et seq.] chapter eighteen of the code of West Virginia, one thousand nine hundred thirty-one, as amended[.]"

Thus, in the current version of W.Va.Code, 18A–2–8, the statute is silent as to whether an employee has a right to receive notice and have a hearing prior to dismissal by the Board of Education. Although the specific language in the statute was removed, this Court, nevertheless, is required to protect any due process rights employees may have who are dismissed under the statute.

In determining employees' due process rights, the first inquiry by this Court must be whether the employees have property or liberty interests in their employment protected by Section 10 of Article III of the West Virginia Constitution and the Fourteenth Amendment to the United States Constitution. In making this determination in the present case, it is helpful to examine W.Va.Code, 18A–2–6 (1989). This statute states, in relevant part, "[a]fter three years of acceptable employment, each service per-

---

**5.** The 1990 amendment added certain language not relevant to this case.

sonnel employee who enters into a new contract of employment with the board shall be granted continuing contract status.... The continuing contract ... shall remain in full force and effect ... unless and until terminated with written notice, stating cause or causes[.]"[6] In Syllabus Point 4 of *Bonnell v. Carr*, 170 W.Va. 493, 294 S.E.2d 910 (1982), we determined:

> "The Legislature by enacting W.Va. Code, 18A–2–6 (1973), which gives auxiliary and service personnel continuing contract status after three years of acceptable employment and providing that their employment could be terminated upon cause *intended to extend a tenure status* to such employees." (Emphasis added).[7]

In other words, a person who has a "continuing contract status" is a tenured employee. In the present case, Mr. Wirt worked for the Board of Education from 1977 until his termination, and the ALJ found he was a tenured employee.

■ There can be little doubt tenured employees have property and liberty interests in their employment. In *State ex rel.*

6. W.Va.Code, 18A–1–1(e) (1981), defines "service personnel" as "those who serve the school or schools as a whole, in a nonprofessional capacity, including such areas as secretarial, custodial, maintenance, transportation, school lunch, and as aides."

7. W.Va.Code, 18A–2–6, was amended three times after the 1973 version of the statute we cited in *Bonnell*. The current version of W.Va.Code, 18A–2–6, however, does not affect our holding in Syllabus Point 4 of *Bonnell*. W.Va.Code, 18A–2–6, now provides in its entirety:

> "After three years of acceptable employment, each service personnel employee who enters into a new contract of employment with the board shall be granted continuing contract status: Provided, That a service personnel employee holding continuing contract status with one county shall be granted continuing contract status with any other county upon completion of one year of acceptable employment if such employment is during the next succeeding school year or immediately following an approved leave of absence extending no more than one year. The continuing contract of any such employee shall remain in full force and effect except as modified by mutual consent of the school board and the employee, unless and until terminated with written notice, stating cause or causes, to the employee, by a majority vote of the full membership of the board before

*McLendon v. Morton*, 162 W.Va. 431, 444, 249 S.E.2d 919, 926 (1978), we stated, with regard to teachers, that tenure is both a "substantial right" and a "valuable property interest." We find such a right and an interest is equally applicable to other school employees whom the legislature has granted tenured status. *See also Duruttya v. Bd. of Educ.*, 181 W.Va. 203, 205, 382 S.E.2d 40, 42 (1989) (a tenured teacher was entitled to procedural safeguards).[8]

■ If employees have property and liberty interests in their employment, the next determination is what due process protection the employees must be afforded. In Syllabus Point 4 of *McLendon*, we said:

> " 'The extent of due process protection affordable for a property interest requires consideration of three distinct factors: first, the private interests that will be affected by the official action; second, the risk of an erroneous deprivation of a property interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, includ-

the first day of April of the then current year, or by written resignation of the employee before that date, except that for the school year one thousand nine hundred eighty-eight— eighty-nine only, the board shall have until the fourth Monday of April, one thousand nine hundred eighty-nine, to initiate termination of a continuing contract. The affected employee shall have the right of a hearing before the board, if requested, before final action is taken by the board upon the termination of such employment.

> "Those employees who have completed three years of acceptable employment as of the effective date of this legislation shall be granted continuing contract status."

8. *Duruttya* was decided after the language with regard to a pre-termination hearing was removed from W.Va.Code, 18A–2–8. Nevertheless, we stated "[b]y enacting the grievance procedures set forth in W.Va.Code §§ 18–29–1 *et seq.* and 18A–2–8, the Legislature clearly intended to ensure that school system employees receive due process in the form of notice and hearing *prior* to their dismissal." 181 W.Va. at 205, 382 S.E.2d at 42. (Emphasis added). The issue of the right to a pre-termination hearing under W.Va.Code, 18A–2–8, was not squarely before this Court in *Duruttya;* therefore, we now find it necessary to more fully address the issue with regard to due process.

ing the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' Syllabus Point 5, *Waite v. Civil Service Commission*, [161] W.Va. [154], 241 S.E.2d 164 (1977)."

*See also Matthews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976); Syllabus Point 5, *Major v. DeFrench*, 169 W.Va. 241, 286 S.E.2d 688 (1982).

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), the Supreme Court addressed substantially the same factors with regard to the right of a pre-termination hearing. In the case, two employees, a security guard and a bus mechanic, were terminated by the Cleveland Board of Education without pre-termination hearings. Although under the law of Ohio employees were provided a full post-termination hearing, the employees challenged their termination for violating their due process rights. After concluding the employees had a property interest in their jobs, the Supreme Court said "some opportunity for the employee to present his side of the case is recurringly of obvious value in reaching an accurate decision. Dismissals for cause will often involve factual disputes." 470 U.S. at 543, 105 S.Ct. at 1494, 84 L.Ed.2d at 504. (Citation omitted).

As to the government's interest in immediately terminating the employees, the Supreme Court stated:

"[A]ffording the employee an opportunity to respond prior to termination would impose neither a significant administrative burden nor intolerable delays. Furthermore, the employer shares the employee's interest in avoiding disruption and erroneous decisions; and until the matter is settled, the employer would continue to receive the benefit of the employee's labors. It is preferable to keep a qualified employee on than to train a new one. A governmental employer also has an interest in keeping citizens usefully employed rather than taking the possibly erroneous and counterproductive step of forcing its employees onto the welfare rolls." 470 U.S. at 544, 105 S.Ct. at 1494–95, 84 L.Ed.2d at 505.

After determining due process required a pre-termination hearing in the case before it, the Supreme Court explicitly said such a hearing need not be "a full adversarial evidentiary hearing," but "[i]t should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." 470 U.S. at 545–46, 105 S.Ct. at 1495, 84 L.Ed.2d at 506. (Citation omitted).

Specifically, the Supreme Court said a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 U.S. at 546, 105 S.Ct. at 1495, 84 L.Ed.2d at 506. The Supreme Court reasoned "[t]o require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee." 470 U.S. at 546, 105 S.Ct. at 1495, 84 L.Ed.2d at 506.

We agree with the Supreme Court's analysis in *Loudermill*. Therefore, we hold under W.Va.Code, 18A–2–8, due process requires a pre-termination hearing of a tenured employee under W.Va.Code, 18A–2–6. It is not necessary for a pre-termination hearing to be a full adversarial evidentiary hearing; however, an employee is entitled to a written notice of the charges, an explanation of the evidence, and an opportunity to respond prior to a Board of Education's decision to terminate the employee. If an employee presents a danger to students or others at work and there is no reasonable way to abate the danger, a pre-termination hearing is not required.[9] *See Loudermill*, 470 U.S. at 545 n. 10, 105 S.Ct. at 1495 n. 10, 84 L.Ed.2d at 505 n. 10.[10] Given that W.Va.

---

9. In the present case, school officials abated any alleged danger posed by Mr. Wirt by switching his work schedule so he would not be at the school when students were present and, subsequently, by suspending him from work.

10. The Board of Education cites *Fayette County Board of Education v. Lilly*, 184 W.Va. 688, 403

Code, 18A–2–8, requires the Board of Education to serve a written copy of the charges within two days of them being presented, we find it is not an unreasonable governmental burden to require "written notice of the charges," instead of oral notice, prior to them being presented to the Board of Education.

■ Applying the preceding principles to the present case, we determine Mr. Wirt was denied due process as the result of not being provided adequate written notice of the charges against him and an explanation of the evidence prior to the Board of Education's meeting. Thus, even though the Board of Education asserts Mr. Wirt and his counsel appeared before it, without sufficient notice of the charges against him, his opportunity to address the Board was meaningless.[11] We find it unnecessary to address Mr. Wirt's remedy for the due process violations because the issue is moot as the result of our conclusion in Section III, *infra*, that the ALJ's decision to reinstate Mr. Wirt is not clearly erroneous.

## III.

### THE ALJ'S FACTUAL FINDINGS

In addition to the due process issue raised in this case, a second issue arises with regard to whether the circuit court's determination that the decision of the ALJ "was not clearly wrong in the view of the reliable, probative and substantial evidence on the whole record" was clearly erroneous. The ALJ essentially found the Board of Education failed to establish by a preponderance of the evidence that an improper touching occurred. The ALJ particularly was concerned with a number of significant discrepancies he found in the testimony.

After reviewing the record, we find several areas in which we disagree with the findings and conclusions of the ALJ with regard to discrepancies in the testimony. For in-

stance, the ALJ concluded Amanda W.'s recollection of the events on September 28 was inconsistent. Although we agree that Amanda W.'s recollection is somewhat inconsistent, we do not find Amanda W.'s testimony was inconsistent in all the respects upon which the ALJ based his decision. The ALJ concluded Amanda W. first alleged the incident

> "occurred in the cafeteria when only one other person was present and later, during cross-examination, related that a lot of students were in a lunch line waiting to be served. She stated that the incident occurred when she was near a stage in the cafeteria putting her coat away. She explained that she had her back to the others present when the incident occurred. Later [Amanda W.] related that it happened when she was in line talking to [Carrie B.]."

Upon review of the record, we cannot find any place where Amanda W. initially states there only was one person in the cafeteria and later states there was a group of students in the cafeteria.

From her first mention of who was present in the room on direct examination, Amanda W. claimed she thought Carrie B. witnessed the incident. The testimony the ALJ seems to be referring to in making his conclusion is when Amanda W. was asked by Mr. Wirt's counsel where she was standing on September 28 when Mr. Wirt allegedly touched her. Amanda W. replied she was putting her coat on the stage in the cafeteria. She then was questioned if she was in the cafeteria because it was lunch time. She replied no, she was helping a photographer on school picture day. Mr. Wirt's counsel asked if there were "a lot of people around *there*?" (Emphasis added). Amanda answered "[j]ust Jackie, and she was already eating." When asked who Jackie was, Amanda stated "[t]he one that helped me, Collins, and then there was

S.E.2d 431 (1991), to support its position that a pre-termination hearing is not required. The decision in *Lilly* is not binding upon this Court because it is a *per curiam* opinion. Cf. Syllabus Point 2, *Graf v. West Virginia University*, 189 W.Va. 214, 429 S.E.2d 496 (1992) ("[a] *per curiam* opinion that appears to deviate from generally accepted rules of law is not binding on the

circuit courts, and should be relied upon only with great caution").

11. For instance, the ALJ found, in part, "[a]t best, the grievant, at the time the Board was to take up the matter, was prepared to defend against the allegation that he had committed one wrongdoing."

people in [the lunch] line and Carrie saw that one." From these responses, it is obvious Amanda did not mean there only was one person in the cafeteria when the incident occurred. Instead, she interpreted "there" as being the stage where she was helping the photographer, and, apparently, someone named Jackie was helping her before Jackie went to eat her lunch.

The next problem we find with the ALJ's conclusion is when he determined Amanda W. said it happened when she was near the stage and, later, said it happened when she was talking to Carrie B. We cannot find anywhere in Amanda W.'s testimony where she says the incident occurred while "she was in line talking to [Carrie B.]." In fact, when Mr. Wirt's counsel asked Amanda W. where she thought Carrie B. was when the incident occurred, she replied "[i]n line with our class." Amanda W. consistently said it happened by the stage. On redirect examination, Amanda W. was questioned whether she remembered speaking with Carrie B. "*after* the incident happened in the cafeteria on picture day[.]" (Emphasis added). Amanda W. said "[Carrie B.] told me she saw it."

The next conclusion the ALJ made was that Amanda W. said "with some certainty that the grievant approached her from her left side, placed his right hand around her and placed his hand *under* her breast. Subsequently, she recounted that he had placed his hand *on* her breast and rubbed it." (Emphasis in original). What Amanda W. actually demonstrated at the hearing, that was narrated for the record by counsel for the Board of Education, was Mr. Wirt's placing his right hand "over [her] shoulder and with his right hand then in position touched [her] right breast." When asked whether Mr. Wirt touched her anywhere else, the Board of Education's counsel stated Amanda W. demonstrated his hand being "[a]bout midway down the buttocks area ... [and] [h]e would bring his arm then up on the right side of [her] body sort of having his arm around [her] body and the hand being under the right breast again." Thus, Amanda W. ap-

parently demonstrated Mr. Wirt touched her on the breast and under her breast.

The ALJ also found it inconsistent that Amanda W. asserted Mr. Wirt " 'patted' her on the buttocks," and alleged he " 'rested' his hand there for 'two or three minutes.' " In referring to where Mr. Wirt had his hand, Amanda W. had the following dialogue with Mr. Wirt's counsel:

"Mr. Katz: You got that statement in front of you, Amanda? You said in the third line, he put his arm around my waist and touched my breast and touched my butt. You show this here with your mother. You put your arm her [sic] waist, as if she were you, and you put your hand flat on ... where the pocket [12] would on [sic] the right hand side. Is that what ... what he did on that day?

"Amanda: He sort of rubbed it.

"Mr. Katz: What do you mean sort of rubbed it?

"Amanda: He brought it down here, and went ... and just let it settle.

"Mr. Katz: I didn't hear the last ...

"Amanda: He laid it and then he sat it still.

"Mr. Katz: Well ..[.] how long did he have his hand on your ... on your buttock?

"Amanda: A couple of minutes." (Ellipses in original).

We can find nowhere in the record where Amanda W. said Mr. Wirt " 'patted' " her buttocks.

In addition, we question any significance the ALJ placed on Amanda W.'s asserting Mr. Wirt "blocked" her from leaving. Amanda W. testified Mr. Wirt "was behind [her] and got beside [her] where [she] couldn't leave." She indicated he was not holding on to her and she was not prevented from walking away from him which she eventually did do to get in the cafeteria line. This Court understands it certainly is possible in this situation that a sixth-grade girl could perceive herself as being "blocked" when an adult male is directly beside her performing the acts Amanda W. alleged occurred.

12. When summarizing Amanda W.'s testimony, Mr. Wirt's counsel identified the pocket as being on jeans.

We agree with the ALJ's findings that, in reference to Mr. Wirt, Amanda W. testified "[s]ometimes he got along with me, and sometimes he didn't"; however, she indicated she and Mr. Wirt did not fight or argue over anything. The ALJ also found Amanda W. stated Mr. Wirt had "never touched her 'in improper places' *before* and had not done so since September 28." (Emphasis added). We agree Amanda W. denied Mr. Wirt's touching her after September 28, but she definitely maintained he "brushed" her breast on September 25 although she thought it was an "accident[.]"

As to Carrie B.'s testimony, we agree with the ALJ that her recollection of the events, at times, conflicts with Amanda W.'s. The most significant conflict is the location of the incident. Amanda W. said it occurred near the stage and her back was to the other children. On the other hand, Carrie B. asserted the incident occurred while she and Amanda were in the lunch line and the two girls were facing each other having a conversation. When Carrie B. was asked whether the incident happened near the stage, Carrie B. said no. Similarly, Mr. Hurt testified Amanda W. was in the cafeteria lunch line when the incident happened.

As to Mr. Hurt's testimony, the ALJ stated, in part, "[s]ignificantly, Mr. Hurt was certain that the incident occurred on September 25 and that [Mr. Wirt] approached [Amanda W.] from her right and used his left hand when he made the inappropriate contact." We do not agree entirely with this conclusion. We find Mr. Hurt never really was clear as to the exact date of the incident, except that he maintained it was on picture day which was Monday, September 28. In a prior statement he gave, Mr. Hurt said the incident in the cafeteria happened on Friday, September 25. When questioned about the date by Mr. Wirt's counsel, Mr. Hurt said "[i]t was the day they took pictures." Mr. Wirt's counsel then asked "[a]ll right, but it was on a Friday," to which Mr. Hurt responded "I can't remember what day ...

exactly what day it was, but I know I seen [sic] it." (Ellipsis in original). Thereafter, Mr. Wirt's counsel asked "well when you signed this statement, are you sure it was on that Friday? That was a Friday wasn't it." Mr. Hurt stated "[y]eah, it was on a Friday."

We do agree generally with the ALJ that there are inconsistencies with the ways Amanda W., Carrie B., and Mr. Hurt described the alleged touching. Such inconsistencies include what arm Mr. Wirt allegedly used, the manner in which he allegedly did the touching, the length of time the alleged incident occurred, and the significantly different accounts of where the alleged touching occurred.

In his analysis, the ALJ determined the witnesses and Mr. Wirt did not appear to be anything other than "forthright in their testimony." The ALJ then stated:

"Further, the discrepancies, in and of themselves, do not support that the witnesses were not being truthful. Nevertheless, the discrepancies are not of the minor, insignificant type of differences in perception which are to be normally expected in the accounts of different witnesses to the same events. They are of the type which cannot be ignored. While it would not be completely accurate to characterize the testimony of [Amanda W.], [Carrie B.] and Mr. Hurt as unreliable, the conflicts in their testimony essentially requires that it be treated as such."

The ALJ went on to say "it can be concluded" that Mr. Wirt made physical contact with Amanda W. on September 25 and September 28; however, "it cannot be concluded with sufficient certainty that the testimony *accurately* portrays the nature of that contact. Since the Board bears the burden in the case, that uncertainty must be resolved in [Mr. Wirt's] favor." (Emphasis in original).

 We review these decisions under the clearly erroneous standard as mandated by W.Va.Code, 18–29–7.[13] This standard does not entitle a reviewing court to reverse

**13.** The standard of review that we discuss in the text of this opinion as applying to this Court is the same standard for a circuit court. This standard includes reviewing the record for errors of law; ensuring the decision is supported by competent, material, and substantial evidence in the whole record; and ensuring the findings and ultimate decision of the ALJ is not clearly erroneous.

the finder of fact simply because it may have decided the case differently.[14] *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). " 'In applying the clearly erroneous standard to the findings of a [lower tribunal] sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*' " 470 U.S. at 573, 105 S.Ct. at 1571, 84 L.Ed.2d at 528, *quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148 (1969). Indeed, if the lower tribunal's conclusion is plausible when viewing the evidence in its entirety, the appellate court may not reverse even if it would have weighed the evidence differently if it had been the trier of fact. 470 U.S. at 573–74, 105 S.Ct. at 1511, 84 L.Ed.2d at 528.[15] Moreover, we must afford the lower tribunal's findings great weight in this case because the factual determinations largely are based on witness credibility. Upon reviewing the evidence in its entirety, we conclude that the ALJ's findings of fact were based on a plausible view of the evidence. The ALJ conducted the hearing and observed the witnesses firsthand, so he was in the best position to make credibility determinations.

Applying these principles to the facts of this case, we are of the opinion that the ALJ's findings were not clearly erroneous. There was a great deal of evidence on both sides of this controversy, and we determine that a finding either way by the ALJ would not have been clearly erroneous. In addition, we note it is difficult in many places in the transcript to determine what exactly occurred because Amanda W. physically demonstrated at the hearing how Mr. Wirt allegedly touched her. The ALJ, sitting as the trier of fact, had the benefit of being present to view these demonstrations and judge the credibility of the witnesses.

## IV.

## CONCLUSION

In sum, we find due process generally requires a pre-termination hearing under W.Va.Code, 18A–2–8. Such a pre-termination hearing need not be a full-scale adversarial evidentiary hearing, but at minimum an employee must be provided with written notice of the charges, an explanation of the evidence, and an opportunity to respond. We find Mr. Wirt was denied adequate notice of the charges against him and, thereby, was denied an adequate opportunity to respond. In addition, we conclude the decision that the Board of Education failed to meet its burden of proof is not clearly erroneous.[16]

For the foregoing reasons, we affirm the order of the Circuit Court of Mercer County.

Affirmed.

BROTHERTON, J., did not participate.

MILLER, Retired J., sitting by temporary assignment.

WORKMAN, J., dissents and reserves the right to file a dissenting opinion.

WORKMAN, Justice, dissenting:

I nominate the majority opinion as the most outlandish decision of 1994. It demonstrates a lack of basic common sense in the determination of school personnel cases, and it creates an open season on children. Even

14. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 765–66 (1948).

15. *See also Bloss & Dillard, Inc. v. West Va. Human Rights Comm'n*, 183 W.Va. 702, 398 S.E.2d 528, 531 (1990); *Frank's Shoe Store v. West Va. Human Rights Comm'n*, 179 W.Va. 53, 365 S.E.2d 251 (1986).

16. The Board of Education argues if this Court affirms Mr. Wirt's reinstatement, Mr. Wirt's award of backpay should be calculated with deductions for unemployment benefits and other income Mr. Wirt received while he was discharged. The circuit court ordered Mr. Wirt be reimbursed his salary, minus usual deductions, "without an offset for other income or unemployment benefits[.]" We affirm the circuit court's decision. However, if Mr. Wirt received unemployment benefits, such benefits may be recovered by the Employment Security Commissioner as provided under W.Va.Code, 21A–10–21 (1989).

the Administrative Law Judge (ALJ), whose findings are accorded great deference, found that the child and her witnesses were truthful and that the grievant custodian, Mr. Wirt, touched this child on her breasts and buttocks.[1] However, the ALJ found the Board had not met its burden of proving the *nature* of the contact.

The ALJ's analysis of the evidence in reaching this conclusion (and the majority's adoption of it) are almost laughable. The ALJ and majority rely on these so-called "inconsistencies" in the evidence:

—Whether Mr. Wirt touched the child's breast from the top or the side;

—Whether the second incident happened by the stage or in the cafeteria line; (By the way, the stage and the cafeteria are in the same room!)

—Whether the grievant "patted" the child's buttocks or merely rested his hand there;

—Whether Mr. Wirt used his left or right arm.

Ye gad! Who cares?! If a school custodian touches a child's body in intimate areas, he should be fired! Even the majority concludes that many of the "inconsistencies" the ALJ relied on really don't exist.

It is utterly absurd that the ALJ found that a school custodian touched this child's buttocks and breast at an elementary school, yet ordered him reinstated with back pay

1. His actual finding was that he had made "physical contact." That term somehow sanitizes what actually happened.

2. Oh yes, he not only gets more than two years of back pay, the majority refuses to offset the amount by the unemployment benefits and other income he received during this period. So Mr. Wirt is in actuality being rewarded for his actions.

The majority says the Employment Security Commissioner can seek to retrieve the benefits paid to Mr. Wirt under West Virginia Code § 21A–10–21 (1989). That section, however, only allows retrieval of benefits only when "paid through error." These benefits were not paid erroneously under unemployment law. Thus, not only does it appear the benefits will not be recoverable thereunder, but the State will have

because the Board didn't prove the *nature* of the contact![2] Just how might the majority suggest that the *nature* of the contact be proven when adults fondle children on intimate parts of their body? Here we have a child with *two eyewitnesses* (one another child and one Mr. Hurt, another school custodian) who witnessed Mr. Wirt touching this child on private parts of her body, with no evidence as to any discernible motive on the part of either of them, or Amanda, to lie about such a serious allegation. The nature of the physical contact and the impropriety of it was certainly clear to Mr. Hurt, the other school custodian, who actually went to Mr. Wirt and told him such conduct was improper.[3]

The Board argues that this reasoning essentially placed a burden of proof upon them that is more commensurate with that required in a criminal case. Under the criminal provisions of West Virginia Code § 61–8(b)–1(6) (1989) sexual contact means an "intentional touching...." That is the only real *legal* issue in this case—whether the Board actually has to prove the *intent* or the act in a school disciplinary context. But the majority goes on for twenty-five pages about non-issues they were more in the mood to discuss.[4]

The majority's reasoning is especially untenable in light of *Adkins v. Gaston*, 192 W.Va. 561, 453 S.E.2d 395 (1994), wherein we held just this week in syllabus point three:

to go to the additional expense of seeking them legally.

Why create all these hoops to jump through when there is a clear, simple, fair way to make the deduction?

3. Mr. Hurt also testified that Amanda wasn't the only child he had witnessed Mr. Wirt fondle.

4. The majority's discusses the pre-deprivation hearing issue for nine pages before concluding it is moot. In that regard, they contend that placing the custodian at the school in the evening hours protected the children. How incredibly naive. Have they forgotten where children go to play after school? The school playground! Mr. Wirt was probably more dangerous with that setup, because there was no one else around to observe his behavior.

The findings of fact of the Board of Review of the West Virginia Department of Employment Security are entitled to substantial deference unless a reviewing court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo.*

166 W.Va. 675, 276 S.E.2d 821, 175 W.Va. 28, 330 S.E.2d 837.

In the instant case, the administrative trier of fact found as a fact that the grievant made physical contact with this child. I do not disagree with this finding and agree we should give it deference. However, the legal issue before us is whether the Board was required to prove the nature of the touching or Mr. Wirt's intent at the time he did the touching. Thus, the question is one of law, and no deference need be accorded the ALJ's legal conclusion for the standard of review is *de novo. See id.*

The majority goes on ad nauseam about the rights of Mr. Wirt—but what about the rights of children like Amanda? Not a word. Children ought to be entitled to a safe environment in our public schools. Parents ought to have the right to send their children to school with piece of mind that they will not be harmed. We have plenty of decent, hardworking people in this State who would happily work as a school custodian, but the majority's opinion places significant restraints on the ability of boards of educations of this State to get rid of the bad apples and fill their positions with decent, hard-working people.

The majority opinion is a good example of why more and more people in this country are fed up with the judicial system. When we treat cases that require a little common horse sense like some kind of esoteric exercise in legal gymnastics, we short-change those who look to us for justice. Each member of the majority should ask himself—is there any doubt in your mind *why* Mr. Wirt fondled this child? The rights of children to be safe in the public schools have been treated in a cavalier manner by the majority of this Court, and the parents of Ramsey Elementary School should caution their children to beware of Mr. Wirt, who will remain in their midst.