**MECHANICAL CONTRACTORS ASSOCIATION
OF CINCINNATI, INC. et al., Appellants,**

v.

**UNIVERSITY OF CINCINNATI, Appellee**

[Cite as *Mechanical Contrs. Assn. of Cincinnati, Inc. v.
Univ. of Cincinnati* (2001), 141 Ohio App.3d 333.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 00AP–665 and 00AP–694.

Decided Feb. 20, 2001.

334

[REDACTED]

*Bricker & Eckler, LLP,* and *Luther L. Liggett, Jr.; Smith, Currie & Hancock, LLP,* and *Aubrey L. Coleman, Jr.,* for appellants.

*Betty D. Montgomery,* Attorney General, and *William C. Becker,* Assistant Attorney General, for appellee.

---

TYACK, Judge.

The University of Cincinnati, defendant in this action, wanted to have a conference center built on land it purchased for that purpose. The university concedes that if it had used appropriated funds to finance direct construction of the conference center, it would have been required to follow R.C. Chapter 153, which provides competitive bidding rules for certain public projects.

The university, however, chose an alternative method for funding and developing the conference center, at an ultimate cost in excess of $60,000,000. On December 1, 1996, the university leased the land it had purchased to Fifth Third Leasing Company ("Fifth Third Leasing"), pursuant to a twenty-seven-year ground lease. The ground lease provided that Fifth Third Leasing would develop a conference center, which Fifth Third Leasing would own, on the land that it was leasing from the university. On the same day, Fifth Third Leasing entered into a lease agreement with the university. Under the terms of the lease agreement, Fifth Third Leasing agreed to lease the completed conference center back to the university until June 1, 2024. In turn, the university agreed to pay rent for the use of the conference center during the balance of the twenty-seven-year term. The rent payments represent the cost of building the conference center, plus interest, amortized over twenty-seven years. When all rent pay-

ments have been paid, the ground lease and the lease agreement will expire and the university will become the fee simple owner of the land and the conference center. The university is making its rent payments from a general receipts fund, which includes monies from student fees, revenues from operations of the conference center, and unrestricted grants, gifts, and donations.

On December 3, 1996, Fifth Third Leasing entered into a development agreement with Walsh, Higgins & Company ("Walsh, Higgins"), an out-of-state contractor. Under the terms of the development agreement, Fifth Third Leasing is the owner and Walsh, Higgins is the developer of the conference center. To build the conference center, Walsh, Higgins entered into a construction agreement with its wholly owned subsidiary, Walsh Construction Company ("Walsh Construction"), which acted as the general contractor. Under the terms of the construction agreement, Walsh Construction was required to select subcontractors through a bidding process consistent with standard business practice in the industry for private construction projects.

On July 10, 1998, after some bidding and construction, but before the conference center had been fully bid, plaintiffs filed the instant lawsuit. Plaintiffs are five construction contractors, Fred B. DeBra Co.; RPC Mechanical, Inc.; Village Building Services, Inc.; Cincinnati Mechanical, Inc.; and Fred A. Nemann Company; and three trade associations, Mechanical Contractors Association; Greater Cincinnati Plumbing Contractors Association, Inc.; and Cincinnati Chapter, National Electrical Contractors Associations, Inc. Plaintiffs requested a declaratory judgment that the university had violated the competitive bidding rules contained in R.C. Chapter 153 and other statutes pertaining to public works contracts. Plaintiffs also sought a preliminary and permanent injunction prohibiting the university from undertaking further construction in violation of competitive bidding rules for public contracts. Finally, plaintiffs also sought money damages "for detrimental reliance in bidding, and lost profits," losses that the plaintiffs purportedly incurred because they had not been awarded subcontracts.

On October 7, 1998, the Ohio Court of Claims issued a preliminary injunction, ruling that "defendant is enjoined from the date hereof from any action in furtherance of bidding of any contract, other than for the project in this action, that is not in compliance with R.C. Chapter 153."

On April 20, 1999, the Court of Claims granted plaintiffs' motion for partial summary judgment, ruling that the university had violated R.C. Chapter 153 because it did not use the statutory competitive bidding procedures for public projects. The Court of Claims permanently enjoined the university from, again, "any action in furtherance of bidding of any contract, other than for the project in this action, that is not in compliance with R.C. Chapter 153."

Following a trial on the issue of damages, on May 22, 2000, the Court of Claims denied plaintiffs' claims for lost profits, prejudgment interest, and attorney fees.

The parties have filed cross-appeals, which have been consolidated by this court. In their appeal, the plaintiffs assert the following two assignments of error:

First Assignment of Error:

"The trial court erred by denying [an] award of money damages as a matter of law."

Second Assignment of Error:

"The trial court erred in not awarding damages on uncontroverted evidence, with pre-judgment interest and attorney fees as a matter of public policy."

The university submits the following three assignments of error:

First Assignment of Error:

"The trial court erred when it held that construction by a private lessee of facilities to be leased to the University in a transaction authorized by R.C. § 3345.12(Q) was subject to the requirements of R.C. Chapter 153."

Second Assignment of Error:

"The trial court erred when it issued an injunction which merely ordered the University not to violate the law without specifying what conduct was being prohibited and which was issued without evidence of any threat of injury to Plaintiffs, all contrary to the provisions of Civil Rule 65(D)."

Third Assignment of Error:

"The trial court erred in deciding it could hear and determine claims affecting the contract rights of private entities that were not, and could not be, joined as parties."

Inasmuch as the issues raised in the university's appeal are potentially dispositive of this appeal, we will address its assignments of error first. By its assignments of error, the university essentially asks this court to review the Court of Claims' April 20, 1999 decision granting partial summary judgment in favor of the plaintiffs and imposing a permanent injunction.

Appellate review of summary judgment motions is *de novo*. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162, 703 N.E.2d 841, 843–844. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103, 701 N.E.2d 383, 384. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that (1) there is no genuine issue of

material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183, 677 N.E.2d 343, 345.

The standard of review for this court regarding the granting of an injunction by a trial court is whether the trial court abused its discretion. *Perkins v. Quaker City* (1956), 165 Ohio St. 120, 125, 59 O.O. 151, 153–154, 133 N.E.2d 595, 598. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

For clarity, we address the university's assignments of error in inverse order.

In its third assignment of error, the university contends that the trial court erred in deciding that it could hear and determine claims affecting the contract rights of private entities that were not, and could not be, joined as parties. The university contends that Fifth Third Leasing, Walsh, Higgins, Walsh Construction, and the successful subcontract bidders should have been joined as parties to this litigation. Because these private parties could not be joined as defendants in the Court of Claims, the university argues, the trial court should have dismissed this action pursuant to Civ.R. 19(B) and the jurisdictional requirements of the Declaratory Judgment Act contained in R.C. 2721.12.

The university prudently concedes, however, that this court already rejected this argument in *Tiemann v. Univ. of Cincinnati* (1998), 127 Ohio App.3d 312, 320, 712 N.E.2d 1258, 1263–1264, a predecessor lawsuit involving similar parties and issues. We decline the university's "opportunity to reconsider" our decision on this issue in *Tiemann.*

The university's third assignment of error is overruled.

In its first assignment of error, the university argues that the trial court erred when it held that construction by a private lessee of facilities to be leased to the university in a transaction authorized by R.C. 3345.12(Q) was subject to the requirements of R.C. Chapter 153.

State universities are authorized by statute to acquire auxiliary or education facilities by a variety of means, including a lease-purchase agreement. R.C. 3345.11 provides:

"Each state university or college may acquire, by purchase, lease, lease-purchase, lease with option to purchase, or otherwise, construct, equip, furnish, reconstruct, alter, enlarge, remodel, renovate, rehabilitate, improve, maintain,

repair, and operate, and lease to or from others, auxiliary facilities or education facilities, and may pay for the facilities out of available receipts of such state university or college. To pay all or part of the costs of auxiliary facilities or education facilities, and any combination of them, and to refund obligations previously issued for such purpose, each state university or college may issue obligations in the manner provided by and subject to the applicable provisions of section 3345.12 of the Revised Code."

In terms of financing, R.C. 3345.12(Q) states:

"A state university or college may sell or lease lands or interests in land owned by it or by the state for its use, or facilities authorized to be acquired or constructed by it under section * * * 3345.11 of the Revised Code, to permit the purchasers or lessees thereof to acquire, construct, equip, furnish, reconstruct, alter, enlarge, remodel, renovate, rehabilitate, improve, maintain, repair, or maintain and operate thereon and to provide by lease or otherwise to such institution, facilities authorized in section * * * 3345.11 of the Revised Code. * * *"

The parties apparently agree, and we concur, that in entering into the ground lease and lease agreement with Fifth Third Leasing, the university was acting pursuant to R.C. 3345.11 and 3345.12(Q). At issue in this assignment of error is whether the university was nonetheless required to follow the competitive bidding laws contained in R.C. Chapter 153. We conclude that the Court of Claims was correct in finding that the university was so obligated.

R.C. 153.01 defines the types of projects that are subject to the competitive bidding rules found in R.C. Chapter 153. R.C. 153.01,[1] in effect at the time the lease was entered, bids taken, and construction started, provides:

"*Whenever any building or structure for the use of the state or any institution supported in whole or in part by the state* or in or upon the public works of the state that is administered by the director of administrative services *is to be erected or constructed,* or whenever additions, alterations, or structural or other improvements are to be made, or heating, cooling, or ventilating plants or other equipment is to be installed or material supplied therefor, *the aggregate cost of which amounts to ten thousand dollars or more, each* officer, board, or other *authority upon which devolves the duty of constructing,* erecting, altering, *or installing the same,* referred to in sections 153.01 to 153.60 of the Revised Code as *the owner, shall cause to be made,* by an architect or engineer whose contract

---

1. R.C. 153.01 was amended on March 18, 1999, to include educational institutions listed in R.C. 3345.50. This opinion addresses the version of R.C. 153.01 that was in effect when this litigation was filed on June 10, 1998. We express no opinion as to whether the amendment to R.C. 153.01 would compel a different conclusion.

of employment shall be prepared an approved by the attorney general and filed with the director, the following * * *[.]" (Emphasis added.)

The university argues that the word "owner" is the "operative term" in construing R.C. Chapter 153 and, thus, dispositive of the issue. Since the university is not the "owner" of the structure and is not the "authority upon which devolves the duty of constructing" the project, R.C. Chapter 153 "is simply irrelevant." In this case, the university contends, since the facility is "owned" by Fifth Third Leasing, a private lessor, R.C. Chapter 153 is not implicated in any manner. We disagree.

Notwithstanding the university's declarations here and in its "lease" that it is merely a lessee, an examination of the substance of its "lease" demonstrates that it is indeed the intended owner for purposes of R.C. Chapter 153. Only by ignoring the realities resulting from this "lease" would one conclude that Fifth Third Leasing is the bona fide "owner" of the conference center.

The indisputable facts of this case support such a finding. The university purchased the property with the intention of improving it with the conference center. The conference center was constructed on public property. Pursuant to statutes pertaining only to the public sector, prevailing wages were paid on the project. By the express terms of the "lease," the property ultimately reverts to the ownership of the university for a sum certain and on a date certain. As discussed *infra,* the sum certain is a nominal amount, calculated by the actual cost of the project, paid by the university in the form of "rent" until such time as the university has essentially paid for the project itself. The actual owner of this property is the university. Indeed, there is evidence in the record in which Fifth Third Leasing disavows control over or responsibility for the project.

The Court of Claims stated that notwithstanding the method used to finance the conference center, "as a consequence of [the university's] intended use of the buildings," the project is a public improvement project, thereby triggering R.C. 153.01. We agree. Accordingly, the Court of Claims did not err in concluding that the university was required to comply with statutory competitive bidding requirements.

We agree with the plaintiffs' contention that R.C. 3345.12(Q) merely provides the university with a lease-purchase financing option, and that it does not exempt the university from the competitive bidding requirements in R.C. Chapter 153. Plaintiffs observe that Ohio has a strong history and public policy favoring competitive bidding for public projects. As a result, it is incumbent upon the university to provide a basis for avoiding the bidding requirements in R.C. Chapter 153.

Plaintiffs direct our attention to *U.S. Corrections Corp. v. Ohio Dept. Indus. Relations* (1995), 73 Ohio St.3d 210, 652 N.E.2d 766, for the proposition that a public agency that enters into a lease-purchase arrangement must still comply with the competitive bidding provisions in R.C. Chapter 153. In that case, the Supreme Court construed R.C. 307.022, a statute that allows counties to lease correctional facilities from private parties, and concluded, *inter alia*, that construction of correctional facilities undertaken pursuant to R.C. 307.022(A) requires compliance ·with competitive bidding and prevailing wage laws. *U.S. Corrections Corp.* does have one glaring factual distinction from this case, upon which the university seizes, in that R.C. 307.022 contains an express provision requiring counties "to contract, in accordance with Chapter 153 * * *, for the construction, improvement, furnishing, and equipping of correctional facilities to be leased * * *." In the instant case, of course, no such provision exists.

Notwithstanding the lack of an express provision, however, we find the rationale of *U.S. Corrections Corp.* persuasive and applicable to the facts before us. The syllabus of *U.S. Corrections Corp.* holds:

"An agreement entered into pursuant to R.C. 307.022 for the lease of correctional facilities must require that *either the lessor or lessee contract* for the construction, improvement, furnishing, and equipping of the facility in accordance with all the requirements of R.C. 307.022, including the requirements of the competitive bidding and prevailing wage laws." (Emphasis added.)

In that the syllabus speaks to "either the lessor or lessee," one significant effect is that compliance with competitive bidding laws may be potentially required of *private* entities under certain circumstances. The court plainly rejected the argument similar to that advanced here by the university, that certain statutory obligations do not apply based solely upon the fact that a *private* entity directly contracts for the project.

The Court of Claims did not abuse its discretion in granting the injunction. Therefore, the university's first assignment of error is overruled.

■ In its second assignment of error, the university contends that the trial court erred when it issued an injunction that merely ordered the university not to violate the law without specifying what conduct was being prohibited and without evidence of any threat of injury to the plaintiffs. The university argues that the injunction is contrary to the provisions of Civ.R. 65(D) because it does not set forth, in specific terms, the acts that the order purports to restrain.

Civ.R. 65(D) provides:

"Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in

reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained * * *.″

"The rule requires that an injunctive order be 'specific and detailed enough to give * * * adequate notice of the requirements imposed * * * and * * * not too vague to be understood.'" *Superior Sav. Assn. v. Cleveland Council of Unemployed Workers* (1986), 27 Ohio App.3d 344, 348, 27 OBR 402, 406, 501 N.E.2d 91, 95. " '[A]n ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.' * * *" *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 60, 556 N.E.2d 157, 162.

We cannot say that the injunction at issue here runs afoul of Civ.R. 65(D). The Court of Claims' order states that "defendant is enjoined from the date hereof from any action in furtherance of bidding of any contract, other than for the project in this action, that is not in compliance with R.C. Chapter 153." The directive is not ambiguous. The trial court did not err in crafting its order since the injunction provides the university with adequate notice as to the acts that the court sought to restrain bidding contracts in violation of R.C. Chapter 153.

The university's second assignment of error is overruled.

Having overruled the university's assignments of error, we now address the cross-appeal filed by the plaintiffs. The plaintiffs' two assignments of error collectively seek review of the trial court's decision denying money damages, prejudgment interest, and attorney fees.

In denying all damages, the Court of Claims summarily held that "[b]ased upon the evidence presented, * * * plaintiffs are not entitled to any relief beyond" the injunctive relief earlier granted. The court cited, without discussion, two cases: *Hardrives Paving & Constr., Inc. v. Niles* (1994), 99 Ohio App.3d 243, 247, 650 N.E.2d 482, 484–485; and, an Eighth Appellate District case, *Cavanaugh Bldg. Corp. v. Cuyahoga Cty. Bd. of Commrs.* (Jan. 27, 2000), Cuyahoga App. No. 75607, unreported, 2000 WL 86554.

In *Hardrives Paving & Constr.*, the Eleventh Appellate District held:

"Injunctive relief should not ordinarily be granted unless irreparable injury will result. * * * Stated otherwise, '[a]n injunction is proper only where there is no adequate remedy at law.' *Fodor v. First Natl. Supermarkets* (1992), 63 Ohio St.3d 489, 491 [589 N.E.2d 17, 19] * * *. It would appear that if monetary damages for lost profits were an available remedy, damages would provide an adequate remedy at law and injunction would not be appropriate. Thus, the fact that injunctive relief is available generally indicates that a monetary award is not available for lost profits.

"Furthermore, other policy considerations militate against allowing monetary damages. The intent of competitive bidding is to protect both the public and the bidders themselves. See *Cedar Bay Constr.,* 50 Ohio St.3d [19] at 21 [552 N.E.2d 202 at 204–205] * * *. Thus, if we were to allow appellant to receive monetary damages, only the bidders would be protected because the public would have to pay the contract price of the successful bidder plus the lost profits of an aggrieved bidder. However, if injunction is the sole remedy, both the public and the bidders themselves are protected." *Id.* at 247–248, 650 N.E.2d at 484–485.

At first blush, the above rationale upon which monetary damages are denied is logical and pragmatic. However, we are troubled by the reality that the limited relief granted results in a public entity's potential ability to violate laws intended to benefit the public without fear of any meaningful reprisal which might deter such violations in the future. In addition, we are mindful of the fact that the plaintiffs who pursue such litigation and prevail in attaining a declaratory judgment favorable to all taxpayers might have no recourse in recouping financial losses incurred in the process.

The minimal case law addressing this dilemma suggests that the remedies of injunction and declaratory judgment on the one hand, and money damages on the other, are necessarily mutually exclusive. Under the circumstances of this case, we cannot sustain the trial court's holding that, as a matter of law, these plaintiffs are entitled to no further relief than injunction.

This litigation has been ongoing for years. The plaintiffs have unceasingly attempted to compel the university to comply with the law and, based upon this record, have had good reason to anticipate that they might eventually, at the very least, recoup in the form of damages a portion of the extraordinary efforts and funds expended. Ultimately, if this court sustains the damages holding, these plaintiffs win only a very expensive, hollow victory in the form of a retrospective, virtually inconsequential wrist-slap to the university and a prospective cautionary declaration. The latter should certainly benefit the public; however, if plaintiffs are not granted more than a hollow victory, an understandable chilling effect would ensue upon future similarly situated would-be plaintiffs.

For the foregoing reasons, the plaintiffs' first and second assignments of error are sustained.

In summary, the university's assignments of error are overruled. Having sustained the plaintiffs' assignments of error, this cause is reversed and remanded to the trial court for a determination of the nature and extent of damages to be awarded.

*Judgment reversed*
*and cause remanded.*

PETREE, J., concurs.

BOWMAN, J., dissents.

BOWMAN, Judge, dissenting.

Being unable to agree with the majority's disposition of the university's first and second assignments of error and the plaintiffs' assignments of error, I respectfully dissent.

According to the majority, the university is obligated to follow the competitive bidding rules found in R.C. Chapter 153 because the university, though a lessee, is really the intended owner of the conference center. I do not agree that the circumstances of the lease are dispositive of the issue. Under the plain, unambiguous language of the statute, R.C. Chapter 153 does not apply. Without legislation requiring it, the university was not required to engage in competitive bidding.

The Ohio Supreme Court has repeatedly stated that "[w]e start with the premise that a public entity is not required to engage in competitive bidding in the absence of legislation requiring it." *Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.* (1995), 73 Ohio St.3d 590, 601, 653 N.E.2d 646, 655–656. See *Shafer v. Streicher* (1922), 105 Ohio St. 528, 534, 138 N.E. 65, 66–67 (refusing to extend the competitive bidding statute to county road maintenance projects absent a clear legislative requirement). The conference center at issue does not fit within the definition of R.C. 153.01. The project was not administered by the director of administrative services. The duty of constructing the conference center did not devolve to the university or to any other officer, board, or authority of the state, nor is the university or any other state authority the owner of the conference center at the time of contracting. Pursuant to the terms of the ground lease, the lease agreement and the development agreement, Fifth Third Leasing is the owner of the conference center.

I do not agree that the terms of the lease or the university's probable ownership of the project at the expiration of the twenty-seven-year agreement transforms the university into the owner at the time of construction. "The principles of statutory construction require courts to first look at the specific language contained in the statute, and, if the language is unambiguous, to then apply the clear meaning of the words used." *Roxane Laboratories, Inc. v. Tracy* (1996), 75 Ohio St.3d 125, 127, 661 N.E.2d 1011, 1012. "Courts do not have authority to ignore the plain and unambiguous language of a statute under the guise of statutory interpretation, but must give effect to the words used." *In re Collier* (1993), 85 Ohio App.3d 232, 237, 619 N.E.2d 503, 506. I believe that the majority exceeded its authority by interpreting the word "owner," a plain and unambiguous term, to include a lessee.

Moreover, I believe that the majority erroneously relies on *U.S. Corrections Corp. v. Ohio Dept. Indus. Relations* (1995), 73 Ohio St.3d 210, 652 N.E.2d 766, in reaching its decision. In *U.S. Corrections Corp.*, the Ohio Supreme Court interpreted R.C. 307.022(A), a statute that allows counties to lease correctional facilities from private parties. R.C. 307.022(A) expressly requires counties "to contract, in accordance with Chapter 153. * * * of the Revised Code, for the construction, improvement, furnishing, and equipping of correctional facilities to be leased pursuant to this section." The *U.S. Corrections Corp.* court concluded that construction of correctional facilities undertaken pursuant to R.C. 307.022(A) required competitive bidding because the statute expressly incorporated the competitive bidding provisions. See *U.S. Corrections Corp.* at 216–217, 652 N.E.2d at 771–773. In contrast to R.C. 307.022(A), the statutes that authorized the lease agreements at issue in the instant action, R.C. 3345.11 and 3345.12(Q), do not incorporate R.C. Chapter 153 or make any reference to competitive bidding requirements. *U.S. Corrections Corp.* is, therefore, inapposite.

While the majority's decision is not without merit from a policy standpoint, I conclude that the General Assembly has not enacted a competitive bidding requirement that applies to a lease-back project such as the conference center project. Absent legislative authority, I would decline to impose the requirements in R.C. Chapter 153 upon the project at issue. See *Danis Clarkco Landfill Co.* at 602, 653 N.E.2d at 656. Whether competitive bidding under these circumstances should be required is for the legislature to determine, not for this court. I would therefore sustain the university's first assignment of error.

I also disagree with the majority's conclusion that the trial court's injunction is not ambiguous. Civ.R. 65(D) provides the following:

"Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained; and is binding upon the parties to the action, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the order whether by personal service or otherwise."

"The rule requires that an injunctive order be 'specific and detailed enough to give * * * adequate notice of the requirements imposed * * * and * * * not too vague to be understood.'" *Superior Sav. Assn. v. Cleveland Council of Unemployed Workers* (1986), 27 Ohio App.3d 344, 348, 27 OBR 402, 406, 501 N.E.2d 91, 95. "'[A]n ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed.'" *Planned Parenthood Assn. of Cincinnati, Inc. v. Project Jericho* (1990), 52 Ohio St.3d 56, 60, 556 N.E.2d 157, 162.

I believe that the injunction at issue runs afoul of Civ.R. 65(D). The Court of Claims' order states that "defendant is enjoined from the date hereof from any action in furtherance of bidding of any contract, other than for the project in this action, that is not in compliance with R.C. Chapter 153." Particularly in light of my determination that the university did not violate R.C. Chapter 153, I would conclude that the injunction does not provide the university with notice as to the acts that the Court of Claims sought to restrain. I would therefore sustain the university's second assignment of error.

Because I believe that the university did not violate R.C. Chapter 153, I would overrule as moot the plaintiffs' assignments of error, which pertain to damages. I disagree with the majority for the additional reason, however, that I do not believe that money damages are an appropriate remedy for a violation of R.C. Chapter 153.

The intent of competitive bidding is not only to protect bidders but also to protect the public. *Cedar Bay Constr., Inc. v. Fremont* (1990), 50 Ohio St.3d 19, 21, 552 N.E.2d 202, 205–206. Ohio courts have recognized that, if unsuccessful bidders are allowed to recover money damages, the bidding laws would harm, rather than protect, the public interest, as "the public would have to pay the contract price of the successful bidder plus the lost profits of an aggrieved bidder." *Hardrives Paving & Constr., Inc. v. Niles* (1994), 99 Ohio App.3d 243, 247, 650 N.E.2d 482, 485. See *Cavanaugh Bldg. Corp. v. Cuyahoga Cty. Bd. of Commrs.* (Jan. 27, 2000), Cuyahoga App. No. 75607, unreported, 2000 WL 86554. I would follow this reasoning and decline to award money damages as a matter of law.

Nor can I agree with the majority's decision to award monetary damages in addition to injunctive relief. Injunctive relief is an equitable remedy which lies only where there is no adequate remedy at law. *Haig v. State Bd. of Edn.* (1992), 62 Ohio St.3d 507, 510, 584 N.E.2d 704, 707. By definition, therefore, a court should not simultaneously award monetary damages and an injunction to remedy the same injury. See *Cleveland v. Cleveland Elec. Illum. Co.*(1996), 115 Ohio App.3d 1, 12, 684 N.E.2d 343, 351.

For the foregoing reasons, I would sustain the university's first and second assignments of error, overrule the university's third assignment of error, overrule as moot the plaintiffs' first and second assignments of error, and reverse the judgment of the Ohio Court of Claims.