557 S.E.2d 863

**AFFILIATED CONSTRUCTION TRADES FOUNDATION, a Division of the West Virginia Building and Construction Trades Council, AFL–CIO, Plaintiff Below, Appellant,**

v.

**The UNIVERSITY OF WEST VIRGINIA BOARD OF TRUSTEES, et al., Defendants Below, Appellees.**

No. 29330.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 23, 2001.

Decided Dec. 12, 2001.

**460**

Vincent Trivelli, Stuart Calwell, the Law Offices of Stuart Calwell, PLLC, Charleston, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, Beth Ann Rauer, Assistant Attorney General, Charleston, for the Appellees, University of West Virginia Board of Trustees and The University System of West Virginia.

Bruce Ray Walker, General Counsel, State College and University Systems, Charleston, for the Appellee, West Virginia Higher Education Policy Commission.

Stephen P. Goodwin, Carrie Goodwin Fenwick, Goodwin & Goodwin, Charleston, for the Appellee, West Virginia University.

James A. Russell, Steptoe & Johnson, Morgantown, and James R. Watson, Ancil G. Ramey, Kara L. Cunningham, Steptoe & Johnson, Charleston, for the Appellee, West Virginia University Foundation, Inc.

Charles M. Johnstone, II, Thaxton & Johnstone, Charleston, for the Appellees, March–Westin Co., Inc., Paul A. Walker Architect, Inc., and Evan Terry Associates, P.C.

Charles M. Surber, Jr., David Allen Barnette, Christina T. Brumley, Jackson & Kelly, Charleston, and Eric H. London, Jackson & Kelly, Morgantown, for the Appellee, Platinum Properties Limited Liability Company and Petropolus and Associates, Inc.

H.F. Salsbery, Madonna C. Estep, Salsbery & Druckman, Charleston, for James A. Prete.

ALBRIGHT, Justice:

The Affiliated Construction Trades Foundation ("ACT"), a division of the West Virginia Building and Construction Trades Council, AFL–CIO, appeals from the September 29, 2000, order of the Circuit Court of Kanawha County, through which the lower court denied ACT's motion to alter or amend the May 23, 2000, decision granting summary judgment to the Appellees, *inter alia*, The West Virginia University Foundation, Inc. (the "Foundation").[1] ACT initiated the underlying action to obtain a declaratory judgment requiring the Appellees to comply with various state laws concerning the payment of prevailing wages to workmen engaged in construction of public improvements,[2] competitive bidding,[3] and the procurement of architectural and engineering services[4] in connection with the building of an administrative office building intended for the use of both West Virginia University and the Foundation. Upon a complete review of the issues raised in conjunction with the record, we affirm the decision of the circuit court. Notwithstanding the technical mootness of the issues raised on appeal given the completion of the construction project at issue, we address those issues, which remain in controversy, under established principles allowing review where the issues are of great public interest.

**I. Factual and Procedural Background**

On October 13, 1999, ACT instituted a declaratory judgment action[5] against the University of West Virginia Board of Trust-

---

1. The other primary Appellees include the University of West Virginia Board of Trustees, the University System of West Virginia, and the West Virginia University.

2. *See* W.Va.Code § 21–5A–2 (1961) (Repl. Vol. 1996).

3. *See* W.Va.Code § 5–22–1 (2000 & Supp.2001).

4. *See* W.Va.Code § 5G–1–3 (1994) (Repl. Vol. 2000).

5. *See* W.Va.Code § 55–13–1 to –16 (1941) (Repl. Vol. 2000).

ees, the University System of West Virginia, and the West Virginia University (hereinafter collectively referred to as "WVU"); the Foundation; as well as various corporations,[6] through which it sought a finding that the planned construction of an office building [7] to be known as the "University Services Center" (the "Center") was a public project governed by the competitive bidding laws and prevailing wage laws of this state.[8] In its petition, ACT averred that WVU was "engaged in a course of conduct aimed at circumventing laws requiring public competitive bidding and laws requiring the payment of prevailing wages."

In support of its petition, ACT alleged that beginning in 1996 WVU and the Foundation began preparations for and subsequently entered into various agreements concerning the design, construction, and lease/purchase of the Center. Among those documents submitted in support of its petition was a memorandum dated February 5, 1997, prepared by Susan L. McCollum, Senior Facilities Planner/Lease Manager, outlining the chronology of events pertaining to the purchase or replacement of the Center. Included in that chronology was an entry dated August 1996, stating: "[I]nvestigated potential process for third party construction and financing." Additional documents attached to the petition include two memoranda prepared by Ms. McCollum dated January 17 and April 17, 1997, which detail the space requirements of current and potential occupants for the Center. When the Foundation issued a "Request for Proposals" dated June 20, 1997, pertaining to providing professional development services for the Center, the document indicated that "[t]he developer is expected to work with WVU and the WVU Foundation staff to develop and define facility layout and design." A supplement to the "Request for

Proposal" was issued on July 18, 1997, specifying that both the Foundation and WVU are seeking and will select an "experienced development firm/team" with the "ability to establish and implement a *turnkey* administrative office building development strategy."

Of the "[n]early fifty firms [that] expressed an interest in the Foundation's initial Request for Proposal," ten firms were jointly interviewed by the Foundation and WVU. As a result of this interviewing and selection process, Platinum Properties Limited Liability Company ("Platinum") was selected to provide a package of development services, including site evaluation and selection, site acquisition, engineering and design, construction, and contract administration. A Pre–Construction Services Agreement ("Pre–Construction Agreement") detailing these obligations was entered into between the Foundation and Platinum on March 19, 1998.

Pursuant to its obligations under the Pre–Construction Services Agreement, Platinum selected and recommended a site for the Center, which was subsequently approved by the Foundation. On September 7, 1999, a second agreement, entitled the Turnkey Construction, Site Development and Purchase Agreement (the "Turnkey Agreement"), was entered into between the Foundation and Platinum. Pursuant to this agreement, Platinum agreed to construct the Center from its own sources at its risk and to sell the improved site to the Foundation upon completion of the Center. The Turnkey Construction Agreement provides that WVU, as the Tenant, has approved the initial plans and further provides that WVU must approve of any change, amendment, refinement, or addition to the approved plans. The agreement further provides for a purchase price of

---

**6.** Among those named as defendants to the declaratory judgment action are: Platinum Properties Limited, Petropolus and Associates, Inc., March–Westin Co., Inc., Paul A. Walker Architect, Inc., and Evan Terry Associates, P.C. One additional defendant, Gates, Calloway Moore & West, LLP, was dismissed by agreed order entered on January 26, 2000.

**7.** According to the Foundation, "by the time the case is submitted for decision, the project will have been completed, the building will have been occupied, and no further work will be performed that would be under any of the contracts relating to the construction project at issue." While the Foundation made these statements in support of its position that the issues before the Court are moot, a point with which we disagree, we wish to point out that the construction project is apparently now complete.

**8.** *See supra* nn. 2, 3, and 4.

$22,821,969.00 upon satisfaction of certain specified conditions.[9]

While a lease-purchase agreement had not been entered into at the time of the filing of the petition, ACT produced documentation demonstrating the intent that a thirty-year lease-purchase contract would be signed by the State with the Foundation "for and on behalf of West Virginia University, as Tenant, for the lower six floors" of the seven-floor Center.[10] A draft lease-purchase agreement, as well as additional documentation, indicated that at the conclusion of the lease term, WVU was to take ownership of the facility. In actuality, however, a lease, rather than a lease-purchase agreement was entered into, but not until May 25, 2001, after the issuance of the circuit court's final ruling in this case.

In response to ACT's petition for declaratory judgment, the Foundation filed a motion to dismiss or in the alternative, a motion for summary judgment. The remaining Appellees similarly filed motions to dismiss.[11] At a hearing on January 26, 2000, the circuit court heard argument of counsel on the petition and the various motions seeking dismissal or summary judgment. By order entered on May 23, 2000, the circuit court granted summary judgment to Appellees. ACT sought to alter or amend the summary judgment ruling by filing a Rule 59(e) motion,[12] which the circuit court denied by order entered on September 29, 2000. Through this appeal, ACT challenges the lower court's denial of the relief it requested below.

## II. Standard of Review

■ We announced the applicable standard in syllabus point one of *Wickland v. American Travellers Life Insurance Co.*, 204 W.Va. 430, 513 S.E.2d 657 (1998): "The standard of review applicable to an appeal from a motion to alter or amend a judgment, made

pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed." In this case the underlying judgment is a grant of summary judgment, so the governing standard is the *de novo* standard as set forth in syllabus point one of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994).

## III. Discussion

### A. Circuit Court's Ruling

In ruling in favor of the Foundation and the other Appellees below, the circuit court focused on the statutes at issue and the two agreements that had been entered into at the time of the hearing—the Pre–Construction Agreement and the Turnkey Agreement. After finding that there are only two parties to each of these agreements—the Foundation and Platinum, the lower court proceeded to determine whether the prevailing wage statute was applicable to the contracts at issue. That statutory provision states that:

It is hereby declared to be the policy of the State of West Virginia that a wage of no less than the prevailing hourly rate of wages for work of a similar character in the locality in this State in which the construction is performed, shall be paid to all workmen employed by or on behalf of any public authority engaged in the construction of public improvements.

W.Va.Code § 21–5A–2 (1961) (Repl. Vol. 1996).

In ruling on the applicability of the prevailing wage statute to the construction of the Center, the circuit court looked to the statutory definitions of the terms "public authority" and "public improvement." A "public authority" is defined by West Virginia Code § 21–5A–1(1) (1961) (Repl. Vol. 1996) as:

---

**9.** Among these conditions was the completion of an attached 750–car parking garage with at least 505 parking spaces secured for use by the Center's occupants.

**10.** This intent was expressed in a letter dated June 24, 1999, that was sent to the Foundation's president from Joseph F. Markus, as Cabinet Secretary for the State Department of Administration.

**11.** As a result of the filing and granting of amicus pleadings, James A. Prete was permitted to participate in the proceedings below. Mr. Prete, an unsuccessful bidder on the project, filed a memorandum in opposition to the Foundation's motion to dismiss.

**12.** W.Va. R. Civ. P. 59(e).

any officer, board or commission or other agency of the State of West Virginia, or any political subdivision thereof, authorized by law to enter into a contract for the construction of a public improvement, including any institution supported in whole or in part by public funds of the State of West Virginia or its political subdivisions, and this article shall apply to expenditures of such institutions made in whole or in part from such public funds.

By definition, a "public improvement" includes "all buildings, roads, highways, bridges, streets, alleys, sewers, ditches, sewage disposal plants, waterworks, airports, and all other structures upon which construction may be let to contract by the State of West Virginia or any political subdivision thereof." W.Va.Code § 21–5A–1(4) (1961) (Repl. Vol. 1996).

Based upon the definitions of "public authority" and "public improvement," the circuit court read the policy language of West Virginia Code § 21–5A–2 to only apply when a "public authority" is a party to the subject contract. To bolster its conclusion, the lower court cited the legislative rule that provides that fair minimum wage rates must be included in all contracts "to which the State of West Virginia, or any political subdivision thereof, or any authority created by the Legislature of the State of West Virginia, including any officer, board or commission or agency of the State of West Virginia, is a party." 42 W.Va.C.S.R. § 7–1.1. In light of its conclusion that the prevailing wage statute only applies when a "public authority" is a contractual party, the circuit court proceeded to determine whether the Foundation could qualify as a public entity.

Relying on this Court's decision in *4–H Road Community Association v. West Virginia University Foundation, Inc.*, 182 W.Va. 434, 388 S.E.2d 308 (1989), the circuit court concluded as a matter of law that:

The West Virginia University Foundation was chartered as a charitable, educational, not-for-profit corporation, by private individuals pursuant to the general corporate laws of the State of West Virginia. Funds coming into the possession of the Foundation, which may be used on behalf of the University, are maintained separately from public funds budgeted for the University. Employees of the Foundation are not public employees and do not participate in any public benefit plan. The president of WVU is a member of the Board of Directors of the Foundation, but by reason of the by-laws of the corporation and not by reason of any statute or legislative rule. As such, the Foundation is neither a public authority nor an institution supported in whole or in part by public funds of the State of West Virginia pursuant to W.Va.Code § 21–5A–1[ (1) ] (citation omitted).

The circuit court also looked to *4–H Road* to conclude that the "Foundation does not become a 'public authority' solely because it constructs a building for the benefit of West Virginia University." As additional support for its conclusion that the Foundation was not a "public authority," the lower court cited this Court's decision in *Woodford v. Glenville State College Housing Corp.*, 159 W.Va. 442, 225 S.E.2d 671 (1976), in which we determined that the Foundation is not an instrumentality of the state. While recognizing that neither *4–H Road* nor *Woodford* were directly on point, the circuit court drew guidance from those decisions based upon the fact that both cases involved the construction of a building by a private, non-profit corporation that was used for the institution's educational mission. And, in each of those cases, the private corporation's status remained unaffected as a result of the contractual arrangement.

After distinguishing the law relied upon by ACT on either factual or statutory bases, the lower court ruled that ACT's claim under the prevailing wage act failed due to the fact "that no public entity is a party to the Turnkey Construction Agreement, or any other contract for construction, architectural, or engineering services related to the Office Building." The circuit court further concluded that it was "not persuaded that WVU's alleged use of the Foundation as a 'conduit' for the construction and financing of the Office Building ha[d] transformed that project into a 'public improvement,' as defined by statute."

Based upon the Foundation's failure to come within the intent of the statutes, the circuit court similarly rejected ACT's claims for relief under the competitive bidding statute and the statute pertaining to procurement of architect-engineer services. Citing the fact that the bidding provisions of West Virginia Code § 5-22-1 (2000 & Supp.2001) only apply to the state and its subdivisions, which are further defined as "the state of West Virginia, every political subdivision thereof, every administrative entity that includes such a subdivision, all municipalities and all county boards of education," the circuit court concluded that the statute did not apply to contracts entered into by a private, not-for-profit corporation, such as the Foundation. W.Va.Code § 5-22-1(a). In like fashion, the lower court examined the applicability of West Virginia Code § 5G-1-2 (1990) (Repl. Vol. 2000) and concluded that the Foundation did not qualify as an "agency," which is defined as "all state departments, agencies, authorities, quasi-public corporations and all political subdivisions, including cities, counties, boards of education and public service districts" for purposes of invoking the provisions of that statute concerning the procurement of certain architectural and engineering services. W.Va.Code § 5G-1-2(a).

In granting summary judgment to Appellees, the lower court ruled that the Foundation did not qualify as an "agency, officer, board, commission, political subdivision, or other administrative entity of the State of West Virginia, or a board of education, service district, or other public authority which is subject to the provisions of the prevailing wages statute, the statute requiring bidding on government construction contracts or the statute relating to the procurement of architect or engineer services." The lower court also relied on the fact that "the Pre-Construction Services Agreement and the Turnkey Construction Agreement between the Foundation and Platinum are contracts between private parties,"and therefore beyond the scope of the subject statutes. Fi-

nally, the circuit court determined that "the development and construction of the Office Building does not constitute a public project, undertaking, or improvement, nor is it transformed into a public project, undertaking, or improvement solely by virtue of WVU's participation in the planning process, anticipated lease of, and/or option to purchase a portion of the completed facility."

## B. Issues on Appeal

ACT argues that the circuit court failed to fully consider all the relevant facts on the issue of WVU's intimate involvement and control over the initial planning and development stages of the Center, continuing through the construction phase, and ultimately culminating with the proposed and now actual occupancy of the Center. In addition to overlooking the significance of facts indicating that the Center was constructed under the auspices of WVU, ACT maintains that the lower court wrongly applied the statutes at issue by focusing exclusively on the identity of the parties to the contracts at issue, rather than examining whether public funds were being expended on a public improvement. ACT further asserts that the lower court wrongly concluded that this Court's decision in *State ex rel. Charleston Building Commission v. Dial*, 198 W.Va. 185, 479 S.E.2d 695 (1996), had no application to this matter and that the lower court either failed to appreciate the guidance of various cases cited by ACT or misconstrued those decisions in making its ruling.

Conversely, the Foundation [13] asserts that the lower court correctly applied the relevant statutes in reaching its decision. The Foundation emphasizes that, contrary to the "sinister" intent that ACT attempts to attribute to it, there was "no evidence in the record before this Court from which ... [to] conclude that the contracts which are the subject of this proceeding were motivated by a desire to avoid the prevailing wage and com-

---

**13.** While there are other Appellees involved in this case, it appears that the Foundation has assumed primary responsibility in defending the case below and has similarly undertaken that role on appeal. Accordingly, when referring to the Foundation as the Appellee in the discussion stage of the opinion, we are referencing the collective position of the other Appellees.

petitive bidding statutes."[14]   In addition to stressing certain facts as indicative of contractual relationships outside the scope of the statutes at issue, the Foundation argues that the issue is moot based on the fact that the Center will have been completed prior to the date this matter is submitted to this Court for decision.   Before addressing the substance of the issues on appeal, we first speak to the Foundation's allegation of mootness.

### C.   Mootness

■   In making its argument that the subject appeal is now moot, the Foundation attempts to convince us that because construction of the Center is now complete and the building is occupied, the underlying issues raised on appeal are no longer worthy of consideration by this Court.   Due to the completion of the project, the Foundation suggests that there is no relief that this Court can award, thereby rendering the issues raised by ACT necessarily moot.   *See* Syl. Pt. 1, *West Virginia Bd. of Dental Examiners v. Storch,* 146 W.Va. 662, 122 S.E.2d 295 (1961) ("The general rule, subject to certain exceptions, is that appeals will be dismissed where there is no actual controversy existing between the parties at the time of the hearing").   The Foundation confuses the concepts of relief and controversy; the controversy between the parties in this case still exists.   *See State ex rel. Missouri Dep't of Labor v. City of Camdenton,* 779 S.W.2d 312, 317 (Mo.Ct.App.1989) (rejecting argument that issue of prevailing wage act's applicability was rendered moot by completion of construction).   Moreover, we need not delve deeply into the issue of whether there is any relief that can be awarded, given our conclusion that the issues raised in this case merit discussion due to the inherent public interest attached to any issues which may involve public funds belonging to this state's citizenry and because of a possible violation of issues of significant public policy.

■   Assuming, arguendo, that we were to acknowledge any technical mootness to one or more of the issues on appeal, the law still permits this Court to address this matter under accepted principles of appellate review:

> Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions presented so as to justify relief;   second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public;   and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

Syl. Pt. 1, *Israel by Israel v. West Virginia Secondary Schools Activities Comm'n,* 182 W.Va. 454, 388 S.E.2d 480 (1989).   Because we conclude that there is an obligation imposed on this Court to address the issue of whether state funds are being expended in accordance with the stated policy of the State to pay prevailing wages to the laborers employed to construct projects furthering the public interest, we view such public interest as the necessary authorization to consider any issue which may be technically moot by either the lack of relief available or by virtue of any decision reached by this Court that arguably extinguishes the controversy between the parties.   We reject the Foundation's argument that no "great public interest" can exist sufficient to warrant application of the *Israel* mootness standard due to the fact that there is presently only one other comparable construction project underway.   *Id.* Rather than focusing in such a narrow fashion on the similarity of other construction projects, we agree with ACT that the requisite public interest arises by virtue of the possible expenditure of public funds in a manner inconsistent with the declared policy of this State.   Consequently, this Court rejects the Foundation's mootness argument, convinced that the facts of this case compel further inquiry into the issue of whether the

---

**14.**  In furtherance of this statement, the Foundation states that "all of the contractors [were] paid prevailing or higher wages, and that more than fifty firms responded to requests for proposals for the project."

method in which certain construction projects are financed can serve as a barrier to application of laws promulgated for the protection of this state's laborers.

### D. Possible Applicability of Statutes Despite Creative Financing

In making its summary judgment ruling, the lower court, consistent with established principles of statutory interpretation, looked to the language of the statutes to resolve the laborer-related issues of wages and bidding. *See In re Greg H.*, 208 W.Va. 756, 760, 542 S.E.2d 919, 923 (2000) (stating that "[i]n interpreting a statute, the initial focus is, of course, upon the statutory language itself"); *accord Maikotter v. University of West Virginia Bd. of Trustees/West Virginia Univ.*, 206 W.Va. 691, 696, 527 S.E.2d 802, 807 (1999) ("In any search for the meaning or proper applications of a statute, we first resort to the language itself."). While the statutory language is clearly the starting point of any issue of statutory interpretation, the legislative intent underlying the statute is the critical second step of any statutory analysis.

#### 1. Prevailing Wage Statutes

■ Like its federal counterpart,[15] the prevailing wage provisions found in West Virginia Code §§ 21–5A–1 to –11 (Repl. Vol. 1996 & Supp. 2001) (hereinafter referred to as the "wage act") were enacted for the purpose of protecting laborers engaged in construction of public improvements from substandard wages by ensuring the payment, as a minimum, of the prevailing level of wages. Section two of our wage act announces the unmistakable policy of this State to secure the payment of the prevailing wage rate for construction performed on public improvements "by or on behalf of any public authority." W.Va.Code § 21–5A–2. In resolving the case below, the circuit court based much of its decision on the absence of any contract having been signed by WVU.

While there is no reference to a contract in section two of the wage act,[16] the lower court read in the need for a contract to invoke the protections of the wage act by virtue of the references to contract letting or authority to enter into a contract contained in the definitions of both "public improvement" and "public authority." *See* W.Va.Code § 21–5A–1(1), (4). Before addressing the issue of the lack of a contract having been signed by a "public authority," however, we wish to first address the related issues of whether the Center is a "public improvement" and whether the Center was constructed on behalf of a "public authority." *Id.*

We note at the outset of this discussion that the procurement of financing for the construction of buildings associated with the educational missions of a public institution often entails the use of creative financing and further, that the employment of certain financial mechanisms necessary to effectuate the construction of such improvements may require the involvement of third parties. Given this recognition of the realities of modern-day financing, we find it incumbent to look behind the surface of the facts relied upon by the circuit court. We are certainly not the first court to analyze whether the provisions of its respective wage act or competitive bidding laws are being circumvented,[17] either through the use of a lease/purchase agreement rather than an outright purchase of a building, or through the use of third-party construction combined with creative financing.

In *Mechanical Contractors Association v. University of Cincinnati*, 141 Ohio App.3d 333, 750 N.E.2d 1217 (2001), the court examined whether competitive bidding statutes were applicable despite the use of a leasing arrangement to acquire a conference center for the university. While the university argued that the bidding laws which imposed

---

**15.** *See* Davis–Bacon Act, 40 U.S.C. § 276a to 276a–5 (1994).

**16.** Section six of the wage act is where the issue of a contract is squarely set forth. *See* W.Va. Code § 21–5A–6 (setting forth requirements concerning contracts between "public authority" and contracting party relative to prevailing wages).

**17.** And, contrary to the implication arising from the Foundation's argument that the lack of evidence demonstrating its intent to violate the wage act conclusively indicates that no violation can be found, we think that such a violation can result without a showing of actual intent to violate the laws at issue.

certain requirements on the property "owner" did not apply based on its lack of *ownership,* the appellate court refused to "ignor[e] the realities" of the situation. *Id.* at 1222. In determining the pivotal issue of ownership, the Ohio Court rejected the university's position that it was merely a lessee under the lease agreement. Instead, the court found significant the fact that the university had purchased the property with the intention of improving it with the conference center; the conference center was constructed on public property; "ownership" of the property automatically reverted to the university for a sum certain on a date certain; and the fact that the "rent" payments calculated by the actual cost of the project "until such time as the university has essentially paid for the project itself" were used as the sum certain "cost" for such reversion of ownership. *Id.* at 1223. Based on these facts, the court found the actual owner of the property to be the university, and thus the bidding statutes were determined to apply. *Id.* Given the absence of a corresponding ownership focus within our prevailing wage and competitive bidding statutes, we are more intrigued with the appellate court's agreement with the lower court that the bidding laws applied "notwithstanding the method used to finance the conference center, 'as a consequence of [the university's] intended use of the buildings[.]'" *Id.* Based on the university's intended use of the conference center, the court had no difficulty affirming the lower court's conclusion that the project was for a public improvement within the meaning of Ohio's laws. Of perhaps even more importance for our analytical purposes, however, was the Ohio Court's rejection of the university's argument "that certain statutory obligations do not apply based solely upon the fact that a *private* entity directly contracts for the project." *Id.* at 1224.

Another decision from which we draw guidance is the *City of Camdenton,* a case in which the Missouri Court of Appeals ruled that the prevailing wage rate was applicable where the municipality sold property to a third party under an arrangement requiring such third party to oversee the construction of a firehouse/police station on the property and then grant the city a lease with an option to purchase the improved property. 779 S.W.2d at 312. Given that the construction project was clearly "for public use or benefit," there was no question that the firehouse/police station constituted a "public works" within the Missouri statute. *Id.* at 316. The municipality advanced the same argument that the Foundation advances here: The prevailing wage rate does not apply since the construction workers are not employed pursuant to a contractual arrangement between a public body and a general contractor. *Id.* In addition, the city cited its option to terminate the lease/purchase agreement after one year. *Id.* at 317. In concluding that the prevailing wage act "is not limited to a project on which the workmen are employed directly by a public body," the Missouri court stated:

> To hold that this *carefully constructed legal facade* insulates the construction of the firehouse/police station from the Prevailing Wage Act would be to place form over substance. The building was to be built according to the plans and specifications of Camdenton. Camdenton retained the right to change those plans and specifications. Camdenton was also granted the power to supervise the construction.... Inherent in the design of the building and its location is a compelling inference that it is to be used by Camdenton.

779 S.W.2d at 316 (emphasis supplied). Describing the arrangement employed by the municipality as "'a financing device,'" the Missouri court concluded that "the workmen on the project are in reality employed on behalf of Camdenton." [18] *Id.* at 316–17. Observing that "[a] city may not do indirectly that which it cannot do directly," the appellate court reasoned that were it "[t]o hold otherwise [it] would [be] lend[ing] judicial approval to an easy method of nullifying the Act." *Id.* at 317.

---

**18.** Like West Virginia Code § 21–5A–2, the Missouri statute defined applicability of its prevailing wage rate with regard to whether the construction project involved workers "employed by or on behalf of" a public body engaged in public works. *See* 779 S.W.2d at 316 (citing Mo.Rev. Stat. § 290.220 (1978)); *cf.* W.Va.Code § 21–5A–2.

In the recent decision of *Division of Labor Standards v. Friends of the Zoo*, 38 S.W.3d 421 (Mo.2001), the Missouri Supreme Court agreed with the position adopted by the intermediate appellate court in *Camdenton* that "[a] public body constructing public works may not circumvent the prevailing wage law by a 'carefully constructed legal facade.'" 38 S.W.3d at 423. At issue in the *Friends* case was whether workers employed by the not-for-profit Friends of the Zoo charitable organization to construct a reptile house for the zoo were in fact "workers ... employed *on behalf of* a public body engaged in the construction of public works." *Id.* at 422. Reversing the lower court's grant of summary judgment to the *Friends*, the Missouri Supreme Court rejected the argument advanced by the *Friends* that the prevailing wage laws could only apply if the private entity in charge of the construction is an agent of the public body. *Id.* at 423. Viewing this interpretation as too narrow, the appellate court concluded: "Where, by all the facts and circumstances, a private entity and a public body create a facade behind which the public body engages in public works, the workers are employed *on behalf of* the city." *Id.* at 424.

Several additional decisions suggest factors that are relevant to resolving the underlying issue of whether, despite the identity of the contracting parties or the nature of the contract itself, the construction work is nonetheless subject to the respective state's prevailing wage laws based on the realities of the situation. In *Hunter v. City of Bozeman*, 216 Mont. 251, 700 P.2d 184 (1985), the court looked beyond the lease agreement governing a municipality's use of a vehicle storage building, which was built pursuant to a separate construction contract to which the city was not a party. Affirming the lower court's decision that the lease "was in fact a sale of the building to the City and that this was in effect a public works project," the court found determinative the fact that the City obtained absolute ownership of the "'leased' building for $10 and retain[ed] ownership of the land" as well as the inclusion of a liquidated damages clause in the event the City failed to renew periodic five-year renewal options during the twenty-year lease period.

*Id.* at 187. In a case which examined as a matter of first instance whether the Oregon prevailing wage laws applied to a build-to-suit lease, the court determined that the critical factor was "who exercised the most control over the project." *Columbia–Pacific Bldg. & Const. Trades Council v. Oregon Comm'n on Pub. Broad.*, 102 Or.App. 212, 794 P.2d 438, 442 (1990). Thus, in deciding whether a state agency "'carried on'" construction, the appellate court looked to the fact that the lessor retained control over financing and construction decisions; the lease was for fair rental value with the option to purchase at full market value; an escape clause left the lessor with all of the risk; and the lower court's conclusion that "the contract was not a subterfuge to avoid paying the prevailing wage." *Id.* at 440. In rejecting the applicability of the Oregon prevailing wage act, the court also found significant the fact that the lessor already owned the land on which the building was constructed; the lessee was not given a reduced purchase price or any other rights in the building under the lease; and the lease agreement "allowed Grayco [lessor] to build what was primarily an easily-rented office building on its own land." *Id.* at 442.

After carefully and thoroughly considering the cases cited by the parties, we reach the conclusion that the question of whether our wage act applies in any given situation is not resolved simply with reference to the signing parties on a particular contract. This is because the real parties in interest may not be signatories to the contracts governing the construction project. As discussed above, the practicalities of modern-day financing may require certain third-party arrangements which tend to shield, in some instances, the full extent of the involvement of the actual party in interest. This necessitates that the examining court must look behind the mere paperwork to examine a host of factors in determining the applicability of the wage act in any given case. As a fundamental matter, we recognize that under West Virginia Code § 21–5A–2, the provisions concerning prevailing wages can only be invoked when a construction project that constitutes a public improvement and which

involves workers employed by or on behalf of a public authority is involved.

In deciding below that a public improvement was not involved based upon the use of the terms "let to contract" contained in the definition of "public improvement," we believe the circuit court focused too narrowly on that part of the definition meant to reference in an all-encompassing fashion "all other structures upon which construction may be let to contract." W.Va.Code § 21–5A–1(4). The key to defining a "public improvement," as recognized by an opinion of this state's attorney general and numerous courts, is the interwoven concepts of public use and public benefit. *See* W.Va. Att'y Gen. Op., No. 10 (Feb. 21, 1989); *Camdenton*, 779 S.W.2d at 316. The determination of whether the construction at issue involves public use, and therefore constitutes a public improvement, requires application of numerous factors. One such set of factors previously identified by counsel for the U.S. Attorney General [19] in analyzing the applicability of the federal prevailing wage act to a lease includes the following considerations:

> We believe that, in general, the determination whether a lease-construction contract calls for construction of a public building or public work likely will depend on the details of the particular arrangement. These may include such factors as the length of the lease, the extent of government involvement in the construction project, the extent to which the construction will be used for private rather than public purposes, the extent to which the costs of construction will be fully paid for by the lease payments, and whether the contract is written as a lease solely to evade the requirements of the Davis–Bacon act [federal prevailing wage act].... [T]he fact that a novel financing mechanism is employed should not in itself defeat the reading of such a contract as being a contract

for construction of a public building or public work.

■ This list of factors, with several modifications, can aid a lower court in its determination of whether a "public improvement" is involved notwithstanding the outward appearances of the contracts or leases at issue. Accordingly, we hold that the issue of whether a "public improvement" is involved within the meaning of this state's prevailing wage act must be determined by examining: (1) whether a public entity initiated the construction project; (2) the extent of control retained by the public entity during the development and construction phases; (3) the extent to which the project will be used for a public purpose; (4) whether public funds are used either directly for the costs of construction or indirectly by means of a lease arrangement which contemplates payments essentially covering the amount of the construction; (5) whether the contract is written as a lease solely to evade the requirements of the prevailing wage act; and (6) all other relevant factors bearing on the ultimate issue of whether the project is indeed a public project notwithstanding novel financing mechanisms.

While, for reasons stated below, we do not set aside the circuit court's findings and conclusions, we wish to comment briefly on the application of these factors to the case *sub judice* for future guidance purposes only. Although several documents submitted as attachments to ACT's petition suggest that WVU was intimately involved in the planning stages of the Center, we have no evidentiary finding relative to this issue. Because no evidence was adduced below [20] with regard to the actual control assumed by WVU during the construction phase we cannot determine the extent of control maintained by WVU throughout the construction phase of the process. ACT produced documentation indicating that 89.5% of the Center was to be

---

**19.** *See* Memorandum dated May 23, 1994, to Thomas S. Williamson, Jr., Solicitor, Department of Labor, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, regarding the applicability of the Davis–Bacon Act to lease contracts. Rejecting the position taken earlier in 1988, the 1994 opinion concludes that "the applicability of the Davis–Bacon Act to any specific

lease contract can be determined only by considering the facts of the particular contract."

**20.** The Foundation strenuously argues that the circuit court gave ACT the opportunity to engage in discovery, but ACT failed to avail itself of this method of obtaining additional evidence.

occupied by WVU and the remainder by the Foundation. In this Court's opinion, the relatively minor use of the Center by a private entity would not foreclose a determination that the use of the Center was primarily public in nature. Although the Foundation stresses the legal right, as required by West Virginia Code § 5A–3–40 (1994) (Repl. Vol. 2000), of WVU to cancel the lease with thirty days notice, we do not find the mere inclusion of such a cancellation clause to be conclusive on the issue of whether a project can be viewed a "public improvement" within the meaning of this state's wage laws. Similarly, we do not find determinative on this issue the fact that the document ultimately executed was only a lease and not a lease-purchase agreement. It is conceivable to this Court that there is still an understanding between the Foundation and WVU governing the use of the building at the conclusion of the lease period.[21] *See Lycoming County Nursing Home Ass'n, Inc., v. Commonwealth of Penn.,* 156 Pa.Cmwlth. 280, 627 A.2d 238, 243 (1993) (reasoning that fact of construction commencement pre-signing of lease agreement indicated Commissioners knew outcome of negotiations would be favorable). In disregarding the applicability of the *Dial* decision, the circuit court overlooked the fact that this Court acknowledged in that decision that a lease-purchase agreement undertaken to provide space for government offices clearly served a public purpose. *See* 198 W.Va. at 199, 479 S.E.2d at 709. In the same fashion, we believe that the leasing device undertaken in this case could be viewed as a creative mechanism of serving the needs of a public entity, WVU, with regard to procuring necessary office space. In this Court's opinion, it would be imprudent to overlook the fact that WVU, rather than the Foundation, was the party who initiated efforts related to the Center's planning and construction. WVU was clearly engaged in a long-term process of obtaining office space to be used primarily by its employees.

■ In foreclosing application of the wage act based upon the fact that WVU did not sign any of the documents under consideration, the lower court has overlooked the insertion of statutory language in West Virginia Code § 21–5A–2 that extends protection of the act when the workers at issue are "employed . . . on behalf of any public authority." *Id.* Following the rationale employed by the court in *Camdenton,* we determine that the absence of a "public authority" as signatory to a document examined in connection with the issue of the applicability of this state's prevailing wage act does not in itself defeat application of the act. Where sufficient facts are submitted to demonstrate that the workers are involved in construction on behalf of any "public authority," the act may still apply. In determining the factual issue of whether the construction is "on behalf of" the "public authority," the trial court should consider whether a public entity initiated the underlying project and all other relevant factors including whether public funding is involved and whether the intended use is for a public purpose. To find otherwise, as the Court observed in *Camdenton,* would amount to sanctioning a relatively easy way to avoid invoking the provisions of the wage act. *See* 779 S.W.2d at 317.

■ Implicit in our holding regarding the factors to consider in evaluating whether a "public improvement" exists for prevailing wage purposes is a recognition that the term "public authority," like the term "public improvement," cannot be used as a shield to prevent the wage act from operating when the public entity for whom the construction is being performed is not a party to a contract. It only stands to reason that if the wage act was intended to extend to those workers who are doing work on behalf of a public authority, then the mere lack of a signature by that

---

**21.** ACT posits that it is more than coincidental that the lease-purchase agreement turned into a mere lease within a short time after the issuance of the decision in the *University of Cincinnati* case where the issue of ultimate ownership of the conference center at issue was key. *See* 750 N.E.2d at 1222–24. Given the statutory emphasis on ownership involved in that decision, we do not find that particular case to be solely influential on the actions of WVU and the Foundation in altering the original plan to enter into a lease-purchase arrangement. We do, however, recognize that it is not beyond the realm of possibility that the issue of ultimate ownership was identified as a factor that might influence any decision in this case.

public authority to a contract should not be permitted to operate in such a fashion to circumvent the intent of this state to fairly compensate those laborers. We acknowledge that the wage act, as currently written, clearly hinges its operation on the existence of a contract having been signed by a public authority. *See* W.Va.Code § 21–5A–6. Barring statutory amendment to section six to include language indicating that an entity acting on behalf of a "public authority" can sign a contract which invokes the protections of the wage act, we feel compelled to read in such language in the interest of upholding the laudatory policy advanced by the wage act of establishing a floor for the workers engaged in construction for the public's benefit. *See* W.Va.Code § 21–5A–2; *see also Banker v. Banker*, 196 W.Va. 535, 543–44, 474 S.E.2d 465, 473–74 (1996) (noting that "in interpreting the terms of our ... statutes specifically, we, in the past, have taken care not to undermine the statutes' fundamental goals" and that "we consistently have turned back neat legal maneuvers attempted by litigants that were not in keeping with overarching duties, responsibilities, and rights that the West Virginia Legislature intended"); *State v. Elder*, 152 W.Va. 571, 575, 165 S.E.2d 108, 111 (1968) (" 'This and other courts will always endeavor to give effect to what they consider the Legislative intent; but, we do not change plain and simple language employed in framing a statute unless there is an impelling reason for so doing.' ") (quoting *Baird–Gatzmer Corp. v. Henry Clay Coal Mining*, 131 W.Va. 793, [805,] 50 S.E.2d 673[, 680 (1948) ]). Accordingly, we conclude that in those instances where it is exceedingly clear that a public entity who qualifies as a "public authority" under West Virginia Code § 21–5A–1(1) is intimately involved with the construction at issue, a trial court may be permitted to reach a conclusion that the wage act should apply notwithstanding the absence of a public authority's actual signature on a subject contract where it can be demonstrated that a contracting party is acting on behalf of the public authority. The concepts previously discussed with regard to determining the existence of a "public improvement," such as identifying who initiated the project; examining the degree of control exercised by the public entity in the planning and development stages; and looking to the nature of the use to which the project will be put, will similarly be useful in deciding whether a third party is acting on behalf of a public authority in entering into contracts involving public improvement-type projects. We find no compelling reason not to extend the protections of the wage act in such instances where a public authority is operating behind the scenes to accomplish purposes that qualify as public in nature. Moreover, we feel constrained to interpret the wage act in this fashion to prohibit the clear intent of the statute from being violated.

### 2. Competitive Bidding Statute

In ruling that the provisions of West Virginia Code § 5–22–1 did not apply, the circuit court, in similar fashion to its rulings relative to the wage act, determined that the identity of the contracting parties prevented the application of such provisions. As we concluded above in discussing the need to look beyond the status of the contracting parties in the wage act analysis section of this opinion, we similarly view the need to examine who the real parties in interest are in determining the applicability of the competitive bidding statute. Our decision to go beyond the four corners of the statutory language is bolstered by our prior recognition in *Pioneer Co. v. Hutchinson*, 159 W.Va. 276, 220 S.E.2d 894 (1975), *overruled on other grounds by State ex rel. E.D.S. Fed'l Corp. v. Ginsberg*, 163 W.Va. 647, 259 S.E.2d 618 (1979), that competitive bidding statutes "are enacted for the benefit of the public, to protect public coffers." *Id.* at 283, 220 S.E.2d at 900.

█ Based on this Court's recognition that public funds are at issue when the state is obligated to make rental payments pursuant to a lease agreement, we find a sufficient public interest at stake to similarly require that a trial court examine certain factors to determine the applicability of the competitive bidding statute. *See Dial*, 198 W.Va. at 199–200, 479 S.E.2d at 709–10. Since the competitive bidding statute applies to the State, which necessarily includes state agencies, then the statute applies to WVU based on its

status as a state agency.[22] Thus, if WVU is determined to be intimately involved in the construction process in the same fashion discussed above with reference to the issue of prevailing wages, the use of a third-party to contract for construction projects cannot insulate WVU from application of the competitive bidding statute. In determining whether the State or its agencies is involved in a construction project sufficient to invoke the competitive bidding protections of West Virginia Code § 5–21–1, a trial court should examine: (1) whether the State or its agency initiated the construction project; (2) the extent of control retained by the State or its agency during the development and construction phases; (3) the extent to which the project will be used for a public purpose; (4) whether public funds are used either directly for the costs of construction or indirectly by means of a lease arrangement which contemplates payments essentially covering the amount of the construction; and (5) all other relevant factors bearing on the issue of whether the construction is properly viewed as government construction.

■ Through this opinion, we wish to emphasize that when a public entity such as the State, or its agencies, initiates a construction project, which upon completion will serve the interests of the State, its agencies, or the public in general, it is incumbent upon the State and/or its agencies to require that the project complies with the requirements of the competitive bidding statute. *See* W.Va. Code § 5–22–1. The State or its agencies cannot escape the requirements of the bidding statute by involving a third-party for the purpose of general construction responsibilities or for the purposes of obtaining the necessary funding.

### 3. Procurement of Architect–Engineer Services

■ As with the bidding statute, the circuit court determined that the Foundation's involvement prevented the provisions of West Virginia Code §§ 5G–1–1 to –4 from

applying. Consistent with our discussion of the application of the bidding statute to a state agency, we conclude that the procurement provisions concerning architectural and engineering services will apply if WVU or some other state agency is intimately involved in the construction process. Accordingly, to determine whether the State or its agencies is involved in a construction project sufficient to invoke the provisions of West Virginia Code § 5G–1–3 governing the procurement of architectural and engineering services, a trial court should examine: (1) whether the State or its agency initiated the construction project; (2) the extent of control retained by the State or its agency during the development and construction phases; (3) the extent to which the project will be used for a public purpose; (4) whether public funds are used either directly for the costs of construction or indirectly by means of a lease arrangement which contemplates payments essentially covering the amount of the construction; and (5) all other relevant factors bearing on the issue of whether the construction is properly viewed as government construction.

### E. Inapplicability of Holdings

■ Given the extremely limited evidentiary development of this case, we cannot apply the holdings we reach today to this case. For example, there is no factual development regarding the level of control that WVU undertook during the construction phase of the Center. Similarly lacking is any evidence concerning the actual use of the Center at the conclusion of the lease period. Most importantly, however, there is no finding that public funds will be expended in connection with the Center.[23] Accordingly, we cannot, on the basis of the record before us, conclusively find that the Foundation was acting on behalf of WVU when it entered into the contracts at issue. It is one thing to surmise the same; quite another to establish proof of this assumption. While we do not wish to suggest that evidence of outright

---

**22.** *See Graf v. West Virginia University*, 189 W.Va. 214, 221, 429 S.E.2d 496, 503 (1992) (stating that "West Virginia University, [is] an agency of the state").

**23.** The circuit court looked to the fact that no lease agreement had been signed at the time of its ruling in concluding that no public funds were involved.

intent to violate the state's wage laws is required to come within the reaches of our holdings here today, there must be more facts than presented here to permit application of the wage act; the competitive bidding provisions; and the architect/engineering procurement provisions that ACT sought to invoke. Yet another reason to refuse to overturn the lower court's decision is the absence of any evidence demonstrating that the prevailing wage rate was not paid to the workers who built the Center. Given the lack of any prevailing wage payment violations, the extremely late stage of this project suggests futility as far as revisiting issues involving the bidding process and the procurement of certain architect or engineering services.

Based upon the findings made by the lower court concerning the lack of any prevailing wage rate violations combined with the lack of any evidence indicating that the contracts at issue were undertaken to avoid application of the wage act, we have no basis from which to conclude that the lower court was in error in granting summary judgment to Appellees. Moreover, without significant factual development, our holdings in this case involving new points of law cannot be applied to this case. Given the manner in which this case reaches us with insufficient evidence of wage violations and a relatively undeveloped record,[24] combined with the finished stage of the project, we deem it improper to remand this case for further development. Accordingly, the decision of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

Justice MAYNARD concurs in part and dissents in part and files a separate opinion.

MAYNARD, Justice, concurring in part and dissenting in part.

I write separately because I am fearful this opinion could have a dramatic and chilling effect on contributors' willingness to continue to give money to the Foundations of our colleges and universities. I realize this is difficult to predict, but I firmly believe that is the likely result of this decision. The people who make the monetary contributions give with an understanding that they are contributing to a private, not-for-profit corporation, and they have a right to expect that the money will be spent wisely, judiciously, and carefully. In fact, they have the right to expect that the people who are charged with spending the money will be downright stingy. When they contribute, they anticipate that the money will be spent on education rather than on inflated costs of building projects.

Therefore, I concur in the final result which the majority reached in this opinion. However, I dissent to the Court's reasoning because the gravamen of the opinion will affect future contracts into which private, not-for-profit corporations enter. I do not believe that a private owner of property should be subjected to West Virginia's prevailing wage laws, competitive bidding statutes, or architectural and engineering procurement measures. I also believe the issues discussed in this opinion are moot and the case should have been dismissed as improvidently granted. The majority opinion directly contradicts itself regarding the mootness issue. In the opening paragraph, the opinion states that the issues presented here are moot but the Court will address them anyway; in footnote seven, the opinion states that the Foundation argues the issues are moot but the majority of this Court disagrees. If this issue had been properly resolved, perhaps we would not be left with this troubling scenario with which we now must wrestle on a case-by-case basis.

Without stating as much, the majority opinion effectively overrules settled law. In *Woodford v. Glenville State College Housing Corp.*, 159 W.Va. 442, 225 S.E.2d 671 (1976), this Court held that a private non-profit housing corporation which constructed a faculty and student housing facility on the Glenville State College campus did not enjoy sovereign immunity because it was not an instrumentality of the State. The purpose of the Housing Corporation was "to borrow necessary funds, to issue securities of the corporation, and ultimately to convey any

---

24. We are disinclined to permit further development when ACT turned down the lower court's opportunity to engage in discovery and evidence gathering.

474

structures constructed in Glenville to the college." *Id.*, 159 W.Va. at 443, 225 S.E.2d at 672. The Court reasoned that the Housing Corporation was not created or granted authority to perform any function on behalf of the State by specific enactment of the Legislature. In reaching its result, the Court reasoned:

Funds for the operation of the Housing Corporation were not appropriated by the Legislature. There was no mandate that revenues received and income produced by the Housing Corporation must or would be paid into the State Treasury rather than expended on its own behalf, and monies available to the Housing Corporation to pay off its debts were not obtainable from a State source. On the contrary, the Housing Corporation was a private, nonprofit, corporation with no call upon the State treasury and it was not subject to State control in any way. Its revenues were limited to contributions, income from rent payments from prospective faculty and students, and from borrowed funds. Most importantly, it was not in any regard liable to creditors for amounts in excess of its assets.

*Id.*, 159 W.Va. at 446, 225 S.E.2d at 674 (footnotes omitted).

Later, in *4-H Road Community Association v. West Virginia University Foundation*, 182 W.Va. 434, 388 S.E.2d 308 (1989) (per curiam), this Court specifically held that the West Virginia University Foundation, the same private organization involved in this appeal, is not a public body because "[the Foundation] was not created by state authority, nor is it primarily funded by state authority[,]" *id.*, 182 W.Va. at 439, 388 S.E.2d at 312–13; therefore, the Foundation was not subject to the FOIA. To reach its decision, the *4-H Road Community Association* Court consulted the statutory definition of "public body" [1] and then reasoned the Foundation was private because: (1) it was formed by private citizens pursuant to the general corporate laws of the State; (2) no legislative mandate predated its incorporation; (3) it is not located on state property; (4) it does not utilize state employees; (5)

selection of the Board of Directors, and their duties, are governed by the corporation's by-laws; and (6) the WVU President serves as an *ex officio* member of the Board by virtue of the by-laws rather than by legislative mandate. *Id.*, 182 W.Va. at 437, 388 S.E.2d at 311. That should be the end of the inquiry. I see no need to disrupt or rewrite the law in this area.

However, this is no longer the test which will be used in West Virginia to determine if a private, not-for-profit corporation is indeed private or public. That test has now been overruled. Any time this Court determines that a private, not-for-profit organization passes the five or six-part "public improvement" test contained in Syllabus Points 4, 7, and 8 of the majority opinion, that organization is subject to the prevailing wage laws, competitive bidding statutes, and architectural and engineering procurement measures. Moreover, one element of the test is "all other relevant factors [which] bear on the ultimate issue of whether the project is indeed a public project notwithstanding novel financing mechanisms." This leaves the test wide open for creative argument. All it takes is a little creativity on the part of a judge and a lawyer and any private entity can now become an instrumentality of the State.

Each of the statutes which govern this case specifically sets forth the entities which are covered. The prevailing wage statute applies to any "public authority" which includes

any officer, board or commission or other agency of the State of West Virginia, or any political subdivision thereof, authorized by law to enter into a contract for the construction of a public improvement, including any institution supported in whole or in part by public funds of the State of West Virginia or its political subdivisions[.]

W.Va.Code § 21–5A–1(1) (1961). Competitive bidding applies to "the state of West Virginia, every political subdivision thereof, every administrative entity that includes such a subdivision, all municipalities and all county boards of education." W.Va.Code § 5–22–1(a) (2000). The architectural and engineering procurement statute applies to

---

1. W.Va.Code § 29B–1–2(3) (1977).

"all state departments, agencies, authorities, quasi-public corporations and all political subdivisions, including cities, counties, boards of education and public service districts." W.Va.Code § 5G–1–2(a) (1990).

These statutes are clear and need no interpretation. To interpret them is to legislate. Nonetheless, the majority rejects and bypasses the plain meaning of the statutes as they are written by claiming to delve into "legislative intent." In fact, the majority admits they are legislating by stating,

> We acknowledge that the wage act, as currently written, clearly hinges its operation on the existence of a contract having been signed by a public authority. *See* W.Va.Code § 21–5A–6. Barring statutory amendment to section six to include language indicating that an entity acting on behalf of a "public authority" can sign a contract which invokes the protections of the wage act, *we feel compelled to read in such language* in the interest of upholding the laudatory policy advanced by the wage act of establishing a floor for the workers engaged in construction for the public's benefit. (Emphasis added).

If the Legislature intended to include private, not-for-profit organizations, the statute would clearly state as much.

After sidestepping the clear meaning of the statutes, the majority forges ahead blindly following precedent from other jurisdictions without so much as recognizing or acknowledging that these statutes vary greatly from jurisdiction to jurisdiction. Nine states do not even have prevailing wage laws and nine states which used to have prevailing wage laws have since repealed them. The laws in the remaining thirty-two states differ vastly. For instance, the contract threshold amounts before the prevailing wage applies to contracts varies from $2,000 in some states to $600,000 in other states. Also, some states specifically include surveyors, public employees, janitors, school boards, truck rentals, and printing in their prevailing wage laws while other states specifically exclude highways, schools, public utilities, local projects, and maintenance.[2] The Supreme Court of Monroe County in New York recognized

the inconsistencies in these laws by stating, "Authority from other jurisdictions is of limited value due to the differing statutory schemes in each state; this is particularly true for those states that provide a statutory definition of 'public work' or 'public project'." *Penfield Mechanical Contractors, Inc. v. Roberts*, 119 Misc.2d 105 n. 1, 462 N.Y.S.2d 393 n. 1 (1983). The taxpayers and gratuitous contributors in West Virginia would certainly be better served if the majority had recognized as much and would have just simply applied the statutes as they are written and followed settled case law from our own jurisdiction.

Moreover, for every case that the majority located and cited which applied the prevailing wage rate or competitive bidding or architectural and engineering procurement statutes a case can be found in another jurisdiction which refused to apply these statutes to a lease arrangement. I believe that these cases are of limited value in this jurisdiction, regardless of which way the court held, without first comparing and contrasting the statutes upon which the decision is based.

Furthermore, the facts in the cases relied upon by the majority differ from the facts in the case *sub judice*. For example, in *State ex inf. Webster v. Camdenton*, 779 S.W.2d 312 (Mo.App.1989), the city sold lots to a contractor requiring the purchaser to build a firehouse and police station on the lots and then to grant the city a lease with an option to purchase the improved property. That is simply not the case here. The City of Camdenton is a public entity; the Foundation is not. The city sold the lots; the university owned nothing to sell—in fact, the contractor was charged with site selection. The city demanded a lease with an option to purchase; the university can cancel their lease at any time with thirty days notice. In *Division of Labor Standards v. Friends of the Zoo*, 38 S.W.3d 421 (Missouri 2001), a charitable organization that was funded by private contributions was building a zoo reptile house on behalf of the city. The parties agreed the reptile house is a "public works;" the zoo superintendent, a city employee, was also the charitable organization's executive director.

---

**2.** *Prevailing Wage Legislation: The Davis–Bacon Act, State "Little Davis–Bacon Acts," the Walsh–Healey Act, and the Service Contract Act,* The Wharton School, Industrial Research Unit, University of Pennsylvania 1988.

Even with these facts, the Supreme Court of Missouri did not hold that the project was subject to the prevailing wage rate; rather, the court remanded for a determination of whether the city, through its employee, was engaging in public works. In the case before the Court, the parties certainly do not agree that the Center is a "public improvement." Also, the president of the university merely serves as an *ex officio* member of the Board by virtue of the by-laws, not by legislative mandate. Since the point is made, I see no need to go on and on.

Because I believe that private entities should not be subjected to these statutes, I would not try to evade the plain meaning by supposedly probing into legislative intent when our law clearly states that "[c]ourts always endeavor to give effect to the legislative intent, but a statute that is clear and unambiguous will be applied and not construed." Syllabus Point 1, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968).

Accordingly, I concur in the majority opinion's final result but respectfully dissent to the court-made law which will govern future contracts that are entered into by private entities in this State.